**ORMET CORPORATION, now known as Ormet Primary Aluminum Corporation, Plaintiff–Appellant,**

v.

**OHIO POWER COMPANY; American Electric Power Service Corporation, Defendants–Appellees,**

**and**

**American Electric Power Company, Incorporated; John M. McManus; John E. Hollback, Jr.; Environmental Protection Agency; Carol M. Browner, as Administrator of the United States Environmental Protection Agency, Defendants.**

No. 95–1835.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 31, 1996.

Decided Oct. 23, 1996.

**ARGUED:** Charles Stanley Warren, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for Plaintiff–Appellant. Janet J. Henry, Porter, Wright, Morris & Arthur, Columbus, OH, for Defendants–Appellees. **ON BRIEF:** Ronald M. Musser, Phillips, Gardill, Kaiser & Altmeyer, Wheeling, WV, for Plaintiff–Appellant. Robert L. Brubaker, Porter, Wright, Morris & Arthur, Columbus, OH; Michael B. Victorson, Robinson & McElwee, Charleston, WV, for Defendants–Appellees.

Before WILKINS, NIEMEYER, and MICHAEL, Circuit Judges.

Vacated and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WILKINS and Judge MICHAEL joined.

## OPINION

NIEMEYER, Circuit Judge:

Congress added Title IV to the Clean Air Act in 1990 to address the problem of acid rain. Title IV prescribes limits for the emissions of sulfur dioxide and nitrogen oxides and authorizes the Environmental Protection Agency (EPA) to issue permits with emission allowances to emit those polluting gases within the prescribed limits. To minimize pollution reduction costs and create incentives for aggressive and innovative pollution control efforts, Title IV authorizes permit holders to sell and transfer emission allowances in a competitive market, intending for allowances to trade as a commodity with durable economic value.

Ormet Corporation, an aluminum manufacturer with a plant near Hannibal, Ohio, brought this action against Ohio Power Company, an electric utility, and affiliated companies, claiming a right to 89% of the emission allowances that the EPA had issued for Ohio Power's Kammer Generating Station, near Moundsville, West Virginia. Ormet based its claim on the assertion that under its contractual arrangement with Ohio Power for electrical power, Ormet pays a proportionate share of the Kammer plant's operating and maintenance costs, and therefore, it is entitled, pursuant to § 408(i) of the Clean Air Act, to its proportionate share of the emission allowances issued for the Kammer plant. Ormet contends that those allowances are worth more than $40 million.

The district court dismissed Ormet's complaint for lack of subject matter jurisdiction. It interpreted Ormet's claim as a challenge to Ohio Power's Acid Rain Permit issued by the EPA and, therefore, a "collateral attack on the EPA's decision to allocate allowances to the private defendants." Observing that Ormet was "involved with the permit process," the court held that Ormet's exclusive avenue to review the EPA's decision to issue the permit to Ohio Power was through § 307 of the Clean Air Act, which provides for review of final EPA action exclusively by the United States courts of appeals. The court thus concluded that it lacked jurisdiction to entertain Ormet's suit.

On appeal, Ormet maintains that it is not challenging any EPA action in issuing the permit or establishing the allowances, but rather asserting a proprietary interest in those allowances now held by Ohio Power. It argues that § 408(i) of the Clean Air Act creates an implied cause of action to adjudicate disputes over emission allowances or alternatively that its cause of action turns on a construction of federal law and that the district court therefore should have entertained the action under its federal-question jurisdiction authorized by 28 U.S.C. § 1331.

We agree with Ormet that § 307 of the Clean Air Act does not apply to its claim, but we do not agree that § 408(i) of the Clean Air Act creates an implied cause of action. Nevertheless, we conclude that Ormet's action arises under federal law within the meaning of 28 U.S.C. § 1331 because resolution of Ormet's claim requires the determina-

tion of substantial federal issues. Accordingly, we vacate the district court's dismissal order and remand this case for further proceedings.

I

Title IV of the Clean Air Act (the "Act"), enacted as part of the Clean Air Act Amendments of 1990, Pub.L. No. 101–549, 104 Stat. 2399 (1990), created an Acid Rain Program under the EPA's administration. The Act prescribes limits for emissions of sulfur dioxide and nitrogen oxides from specified electric utility plants in the contiguous 48 states, including the Kammer plant. 42 U.S.C. §§ 7651c–7651d. The Act requires that owners or operators of fossil fuel-fired combustion devices, referred to as "units," obtain emissions permits from the EPA for each location or "source" where units exist. 42 U.S.C. § 7651g. As part of the permit application, a designated representative of the owner or owners must submit a "certificate of representation" in which he must certify his authority to act on behalf of the owner or owners. 42 U.S.C. § 7651g(i); 40 C.F.R. § 72.24. Each permit allocates to each unit a number of emission "allowances" authorized by statute for the location, and each allowance authorizes the holder to emit one ton of sulfur dioxide. 42 U.S.C. §§ 7651g(a), 7651a(3). The Act provides that these emission allowances may be bought and sold as any other commodity. 42 U.S.C. § 7651b(b); 101 Cong. Rec. S16980 (daily ed. Oct. 27, 1990) ("[A]llowances will be treated in part like economic commodities." statement of Sen. Moynihan). To simplify administration of the Act, the Act provides that where there are multiple owners of a fossil fuel-fired unit, the designated representative must hold the allowances issued for it and distribute them and the proceeds from transactions involving them. 42 U.S.C. § 7651g(i).

By establishing a system of marketable allowances, the Act intends to maximize the range of choices that emission sources have for complying with their emission limitation requirements, thereby minimizing costs and maximizing flexibility and economic efficiency in reducing pollution. Thus, a holder of allowances who has addressed pollution emissions and reduced them below the levels authorized may sell the excess allowances to the owner of some other unit who has need of greater emission authority. The transferability of allowances having durable economic value is, accordingly, expected to create incentives for aggressive and innovative efforts to control pollution.

Ormet claims that it is a partial owner of the Kammer plant and therefore is entitled to a proportionate share of the plant's allowances. To enforce its claim, Ormet filed this action in the district court against Ohio Power and affiliated companies and employees,[1] seeking a declaratory judgment that it owns 89% of the allowances issued for the Kammer plant because it is contractually obligated to contribute to the operation and maintenance of each of the plant's units for the "life of the unit," and it has paid 89% of those costs. See 42 U.S.C. § 7651a(27); 40 C.F.R. § 72.2 (defining owner to include a party with a life-of-the-unit contractual arrangement).[2] Ormet alleges that because it is a participating own-

---

1. In addition to Ohio Power, Ormet sued Ohio Power's parent, American Electric Power Company, Inc.; a service company for American Electric Power, American Electric Power Service Corporation; and two employees of the service company, John M. McManus and John E. Hollback, Jr., who were the designated representative and alternate designated representative for the Kammer plant.

2. Section 402(27) of the Act defines such an arrangement as follows:

The term "life-of-the-unit, firm power contractual arrangement" means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of capacity and associated energy generated by a specific generating unit (or units) and pays its proportional amount of such unit's total costs, pursuant to a contract either—
(A) for the life of the unit;
(B) for a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or
(C) for a period equal to or greater than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit was built, with option rights to purchase or release some portion of the capacity and associated energy generated by the unit (or units) at the end of the period.
42 U.S.C. § 7651a(27).

er, § 408(i) of the Act—which provides that where there are multiple owners, "allowances and the proceeds of transactions involving allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement"—entitles it to a share of the Kammer plant allowances. 42 U.S.C. § 7651g(i). In its complaint Ormet also seeks an injunction prohibiting Ohio Power and its affiliates from "using, transferring, selling, encumbering, disposing or otherwise exercising control over plaintiff's share of the allowances." The facts alleged in the complaint, which we accept as true in reviewing a dismissal order, reveal that in 1957 Ormet entered into a series of agreements with Ohio Power to satisfy Ormet's electrical power needs for its new aluminum production plant in Hannibal, Ohio. Under those agreements, Ormet became the owner of two of three fossil fuel-fired units at the Kammer plant, and Ohio Power became the owner of the third. The parties also agreed to undivided ownership of the common areas in proportion to their ownership of the units.

In 1966, as Ormet's power needs increased, Ormet and Ohio Power revised their arrangement and executed a new contract entitled "Power Agreement" under which Ohio Power acquired all of Ormet's ownership interest in the Kammer plant. Under the new agreement, Ohio Power agreed to supply Ormet with specified amounts of electrical power, and Ormet agreed to pay for Kammer plant costs in proportion to the amount of power taken. The 1966 Power Agreement had a 25-year term with an option for a 5-year extension, which Ormet exercised in 1991. Ormet alleged that it has taken approximately 89% of the Kammer plant's power capacity under the 1966 Power Agreement and has paid 89% of the plant's operating costs.

Upon enactment of Title IV of the Clean Air Act in 1990, Ohio Power designated employees of an affiliated company as its "desig-nated representative" for obtaining and administering the Acid Rain Permit, including holding the allowances issued for the Kammer plant. Ormet alleged that because Ohio Power's designated representative failed to name Ormet as an owner in Ohio Power's Acid Rain Permit application submitted to the EPA, the designated representative falsely and misleadingly certified to the EPA that Ohio Power was the sole owner of the Kammer plant and that it alone was entitled to all allowances. *See* 40 C.F.R. §§ 72.20–.25. Ormet alleged that through these misrepresentations, Ohio Power "expropriated" all of the Kammer plant's emission allowances, when in fact Ormet is entitled to 89% of them as a party with a "life of the unit, firm power contractual arrangement" under the Act.

Ormet's complaint thus raised as the core issue whether the 1966 Power Agreement is a "life-of-the-unit, firm power contractual arrangement" within the meaning of §§ 402(27) and 408(i) of the Act, entitling it to a proportionate share of the emissions allowances issued for the Kammer plant. Treating the issue as one reviewable only by direct appeal to the United States courts of appeals under § 307 of the Act, the district court dismissed the complaint for lack of subject matter jurisdiction.

## II

Ohio Power argues that however Ormet characterizes its complaint, its allegations amount to a challenge both to the sufficiency of Ohio Power's Acid Rain Permit application, which failed to disclose Ormet as a part owner of the Kammer plant, and to the permit that issued on the misleading application. Ohio Power contends that the EPA's issuance of the permit constituted final agency action reviewable only by the United States courts of appeals under §§ 307(b)(1) and 307(e) of the Act.[3] *See Harrison v. PPG*

---

**3.** Section 307(b)(1) of the Act provides in relevant part:

A petition for review of … final action taken by the Administrator under this chapter … may be filed only in the United States Court of Appeals for the appropriate circuit.

42 U.S.C. § 7607(b)(1).

And § 307(e) provides:

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

*Indus., Inc.,* 446 U.S. 578, 589, 100 S.Ct. 1889, 1896, 64 L.Ed.2d 525 (1980). Since Ormet did not avail itself of the Act's exclusive avenue of review, Ohio Power insists that the district court lacked subject matter jurisdiction. *See Virginia v. United States,* 74 F.3d 517, 523–26 (4th Cir.1996).

Agreeing with Ohio Power, the district court noted that even though Ormet had submitted written comments to the EPA to correct Ohio Power's misrepresentations in its certificate of representation about ownership of the Kammer plant, the EPA took final action by issuing an acid rain permit to Ohio Power for the Kammer facility. The court concluded:

> The filing of the Certificate of Representation is an integral part of the process promulgated by the EPA to implement the Acid Rain Program. As such, an attack on the validity of the Certificate of Representation is a collateral attack on the EPA's decision to allocate allowances to the private defendants.

Because § 307 of the Act authorizes review of final EPA action only by direct appeal to the United States Court of Appeals "for the appropriate circuit," 42 U.S.C. § 7607, the district court concluded that it lacked subject matter jurisdiction and dismissed the complaint.

Ormet acknowledges that it submitted written comments to the EPA on the Kammer plant permit application, attempting to have the certificate of representation amended to reflect its ownership interest. It notes, however, that the EPA refused to evaluate the merits of Ormet's submitted written comments because the EPA was prohibited from doing so by its own regulations which provide that the EPA will not resolve private disputes regarding parties' entitlement to allowances. *See* 40 C.F.R. § 72.25(c). Ormet contends that because the EPA was not authorized to review the merits of Ohio Power's certificate of representation, its inaction did not constitute a reviewable "final action." Moreover, Ormet notes, it did not dispute the EPA's understanding of its own limited authority on issues relating to ownership rights in allowances because it believed that the EPA's position was consistent with Congress' intent. In the absence of any EPA action, Ormet argues, § 307 of the Act does not apply.

■ We agree with Ormet's position. In establishing a system of marketable allowances, Congress intended for disputes among allowance holders to be resolved in the same manner as are other private commercial disputes. Congress did not intend that the EPA be involved in resolving allowance-related disputes. As its legislative history reveals, § 408(i) was "not intended to put any additional burden on the Environmental Protection Agency," and Congress did "not expect EPA to be burdened with the responsibility of using scarce resources to rigorously examine the relationship between the various parties whenever there are multiple interest holders in a unit." 136 Cong. Rec. S3379 (daily ed. March 28, 1990) (statement of Sen. Sanford).

Consistent with Congress' intent to keep the EPA out of the business of resolving competing claims to allowances, EPA regulations provide that multiple owners be represented by a single designated representative with whom the EPA would deal exclusively and with binding effect on all owners' interests. *See* 40 C.F.R. §§ 72.20, 73.32. And the EPA will not "adjudicate any private legal dispute concerning the authorization or any submission, action, or inaction of any designated representative." 40 C.F.R. § 72.25(c). Rather, "[o]nce a complete certificate of representation has been submitted ... the Administrator will rely on [it] unless and until a superseding complete certificate is submitted." 40 C.F.R. § 72.25(a). Persons having objections to the actions of a designated representative cannot cause the EPA "to stay any allowance transfer, any submission, or the effect of any action or inaction under the Acid Rain Program." 40 C.F.R. § 72.25(b).

Consequently, when Ormet objected to the EPA about the Ohio Power representative's certifications of ownership, the EPA appropriately refused to resolve the issue. As the

42 U.S.C. § 7607(e).

EPA argued before the district court, "Congress did not intend to burden[the] EPA with the responsibility of resolving private disputes over a unit's allowances." Rather, the EPA relied on the certifications of the designated representative, leaving such ownership disputes for resolution elsewhere. Accordingly, there was no EPA action to review pursuant to § 307 of the Act. While agency inaction is reviewable under certain circumstances, see *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C.Cir.1987) (agency inaction constituting an abdication of statutory responsibility is reviewable), no one presses such an argument here.

Because the EPA's inaction did not constitute final agency action, the exclusive review provisions of § 307 did not apply. And Ormet's failure to appeal under § 307, therefore, could not have been the basis for the district court's finding of a lack of subject matter jurisdiction.

### III

Notwithstanding our agreement with Ormet that § 307 does not apply to its claim, Ormet still bears the burden of demonstrating subject matter jurisdiction. Attempting to discharge that burden, Ormet contends that § 408(i) of the Act created a private cause of action and that therefore this action, based on § 408(i), arises under federal law, thus creating federal-question jurisdiction under 28 U.S.C. § 1331. Ormet argues that because Congress, in enacting § 408(i), created an entitlement to allowances, persons seeking recognition of that entitlement have, by implication, a private cause of action under that section.[4] We disagree.

■ We begin with the presumption that if a statute does not expressly create a private cause of action, one does not exist.

See *Louisiana Landmarks Soc., Inc. v. City of New Orleans*, 85 F.3d 1119, 1123 (5th Cir.1996); *Statland v. American Airlines, Inc.*, 998 F.2d 539, 540 (7th Cir.), cert. denied, 510 U.S. 1012, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993). By now, Congress is well aware of this presumption and how to provide private remedies. See *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979). Nonetheless, we may infer the existence of a private cause of action by applying the well settled test which requires that we determine (1) whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether implication of a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action sought is "one traditionally relegated to state law." *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (internal quotations omitted); see also *Suter v. Artist*, 503 U.S. 347, 364 n. 16, 112 S.Ct. 1360, 1370 n. 16, 118 L.Ed.2d 1 (1992). Factors (2) and (3) form the heart of the inquiry. See *Newcome v. Esrey*, 862 F.2d 1099, 1103 (4th Cir.1988).

■ Examining the legislative history and statutory scheme, we find no indication that Congress intended to create a private cause of action in enacting § 408(i). In establishing a system of marketable allowances, the Act creates proprietary interests in emissions allowances and provides for their transferability. While the Act gives certain persons rights to those allowances, it provides no mechanism for enforcement of those rights. *Cf.* 42 U.S.C. § 7604 (Clean Air Act's citizen suit provision). On the contrary, the Act expressly manifests a hands-off policy to-

---

**4.** Section 408(i) of the Act provides in relevant part:

No permit shall be issued under this section to an affected unit until the designated representative of the owners or operators has filed a certificate of representation with regard to matters under this subchapter, including the holding and distribution of allowances and the proceeds of transactions involving allowances. Where there are multiple holders of a legal or equitable title to, or a leasehold interest in,

such a unit, or where a utility or industrial customer purchases power from an affected unit (or units) under life-of-the-unit, firm power contractual arrangements, the certificate shall state (1) that allowances and the proceeds of transactions involving allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement.... 42 U.S.C. § 7651g(i).

wards disputes over allowances and seeks only to clarify "the ways in which the allowance system would mesh with private-commercial relationships among multiple owners of power plants." 136 Cong. Rec. S3365, S3379–80 (daily ed. Mar. 28, 1990) (statement of Sen. Baucus). We believe it clear that Congress intended that disagreements over the allocation of allowances be resolved by existing methods of dispute resolution within the framework of existing commercial relationships. As the Senate Report explains, "the allowance system is designed so that the allowances will be treated in part like economic commodities . . . [subject to] commercial, antitrust and other relevant laws. . . ." S.Rep. No. 228, 101st Cong., 2d Sess. 321 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3704. We can find no need for, nor any Congressional intent to supply, a private federal cause of action under § 408(i) of the Act.

Also briefly examining the first factor—whether the provision confers a special benefit to parties to a "life-of-the-unit, firm power contractual arrangement"—we note that § 408(i) of the Act does provide for divided ownership of emission allowances when it states that "[n]o [Acid Rain] permit shall be issued" unless the designated representative has "filed a certificate of representation" in which he certifies that "allowances and the proceeds of transactions involving allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement." 42 U.S.C. § 7651g(i). But we view this provision as establishing conditions of and instructions for the permitting process under the administration of the EPA. While a party to a "life-of-the-unit, firm power contractual arrangement" receives a benefit from § 408(i), we do not conclude that the section was enacted especially to provide that benefit. *See California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981) (the question is "not simply who would benefit . . . but whether Congress intended to confer federal rights upon those beneficiaries"); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) ("the mere fact that the statute was designed to protect [certain individuals] does not re-

quire the implication of a private cause of action . . . on their behalf"); *Former Special Project Employees Ass'n v. City of Norfolk,* 909 F.2d 89, 92 (4th Cir.1990).

## IV

Our determination that § 408(i) of the Act does not create a private cause of action does not fully resolve the question of whether Ormet's claim, alleging ownership of emission allowances by virtue of § 408(i), arises under federal law so as to establish federal-question jurisdiction under 28 U.S.C. § 1331.

■ While it is true that in the "vast majority" of cases where federal-question jurisdiction exists, federal law creates the plaintiff's cause of action, *see Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986), federal-question jurisdiction is not limited to cases where federal law creates the cause of action. There is a small class of cases where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 2856, 77 L.Ed.2d 420 (1983) (federal jurisdiction exists when plaintiff's right to relief "necessarily depends on resolution of a substantial question of federal law"); *see also Merrell Dow,* 478 U.S. at 808–09, 106 S.Ct. at 3232–33; *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 199, 41 S.Ct. 243, 245, 65 L.Ed. 577 (1921) (federal jurisdiction exists when right to relief "depends upon the construction or application" of federal law and the claim "is not merely colorable"). Generally, this means that if "the right set up by [a] party may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction," jurisdiction can be had in the federal courts. *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 822, 6 L.Ed. 204 (1824) (Marshall, J.); *see also Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 807–08, 108 S.Ct. 2166, 2173–74, 100 L.Ed.2d 811

(1988) (quoting *Pratt v. Paris Gaslight & Coke Co.*, 168 U.S. 255, 259, 18 S.Ct. 62, 64, 42 L.Ed. 458 (1897)); *Gully v. First Nat'l Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936) (Cardozo, J.).

■ In order for a case in which the cause of action is not federally created to arise under federal law, however, the federal interest at stake must be substantial; "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow*, 478 U.S. at 813, 106 S.Ct. at 3234. The determination of whether a federal issue is sufficiently substantial should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic. *Id.* at 813–14, 106 S.Ct. at 3234–35; *Custer v. Sweeney*, 89 F.3d 1156, 1168 (4th Cir.1996). At bottom, we must determine whether the dispute is one that Congress intended federal courts to resolve, taking into account the historical reasons for establishing federal courts. *See Merrell Dow*, 478 U.S. at 826–27, 106 S.Ct. at 3241–42 (Brennan, J., dissenting) (cataloging "well known" reasons for federal jurisdiction).

■ In this case, Ormet contends that it is a part "owner," as defined by the Act, of three pollution-emitting units, and that therefore it is entitled to a proportionate share of the emission allowances issued by the EPA for those units. While the parties have not disputed the existence of the contractual terms controlling their relationship, they do dispute whether those terms make Ormet an "owner" within the meaning of the Act. And to resolve that dispute, a court must interpret both the Act and the contract to decide whether Ormet is party to a "life-of-the-unit, firm power contractual arrangement," as that phrase is defined in the Act. *See* 42 U.S.C. § 7651a(27). Accordingly, resolution of the dispute requires the interpretation and application of the Act to the contractual arrangement between the parties. This is undoubtedly a federal question and, we believe, sufficiently substantial to justify invocation of federal-question jurisdiction.

Critical to the Acid Rain Program is the Act's creation of freely transferable allowances. The resulting pollution allowance market is an important element of the program, designed to create incentives for reducing the nation's air pollution and resulting acid rain. As the Senate Report summarizes:

> [T]he allowance system is designed so that the allowances will be treated in part like economic commodities and that as such they will stimulate pollution sources to engage in actions that will advance both the environmental and economic objectives of this title.

S.Rep. No. 101–228 at 321, 1990 U.S.C.C.A.N. at 3704. While routine transactional questions about the sale and transfer of allowances are to be resolved through application of standard principles of commercial law, the issues about who is entitled to share in the EPA's initial allocation of allowances, affecting title to subsequent ownership, and what is the nature of the ownership interest in such allowances raise questions of federal law. And the uniform resolution of these questions ultimately affects the nature of the allowances and their transferability, thereby implicating the important federal interest in the Acid Rain Program.

■ For allowances to "be treated like economic commodities," their nature and those entitled to an interest in them must be uniformly established throughout the market. State by state variations of interpretation about the nature and the initial title to allowances could create uncertainty in the market and thereby undermine the very device that Congress created for reducing pollution. Where the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts. *See Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 347–48, 4 L.Ed. 97 (1816) (Story, J.).

Because adjudication of Ormet's claim implicates a substantial federal interest, we hold that this action arises under federal law within the meaning of 28 U.S.C. § 1331. *Cf. Milan Exp. Co. v. Western Surety Co.*, 886 F.2d 783, 787 (6th Cir.1989) (finding that Congress' desire to protect motor carriers

808

from fraudulent brokers and the "historical federal interest in the regulation of interstate commerce" justified federal jurisdiction over plaintiff motor carriers' suit to collect on bonds); *West 14th St. Comm. Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 194 (2d Cir.) (holding in the alternative that suit arose under Condominium and Cooperative Abuse Relief Act where party's right to possession was created by the Act), *cert. denied*, 484 U.S. 850, 871, 108 S.Ct. 151, 200, 98 L.Ed.2d 107, 151 (1987); *Christopher v. Cavallo*, 662 F.2d 1082, 1083–84 (4th Cir.1981) (holding that contract action for breach of warranty of good title based on representation that copyright was not infringed arose under federal law); *Chicago & North Western Transp. Co. v. Atchison, Topeka, and Santa Fe Ry.*, 609 F.2d 1221, 1224 (7th Cir. 1979) (finding federal jurisdiction over plaintiff's suit to recover costs of de-icing services required by tariff division agreement because federal government had substantial interest in regulating tariff divisions), *cert. denied*, 470 U.S. 1003 (1985).

For the reasons stated, we vacate the district court's order dismissing Ormet's claim for lack of subject matter jurisdiction and remand this case for further proceedings.

*VACATED AND REMANDED.*