**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ORMET PRIMARY ALUMINUM
CORPORATION, a/k/a Ormet
Corporation,
Plaintiff-Appellant,

v.

OHIO POWER COMPANY; AMERICAN
ELECTRIC POWER COMPANY,
INCORPORATED; AMERICAN ELECTRIC
POWER SERVICE CORPORATION; JOHN
M. MCMANUS; JOHN E. HOLLBACK,
JR.,
Defendants-Appellees,

No. 99-1419

and

THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; CAROL M.
BROWNER, as Administrator of the
U.S. Environmental Protection
Agency,
Defendants.

ORMET PRIMARY ALUMINUM
CORPORATION, a/k/a Ormet
Corporation,
Plaintiff-Appellee,

v.

OHIO POWER COMPANY; AMERICAN
ELECTRIC POWER SERVICE
CORPORATION,
Defendants-Appellants,

No. 99-1454

and

AMERICAN ELECTRIC POWER
COMPANY, INCORPORATED; JOHN M.
MCMANUS; JOHN E. HOLLBACK, JR.;
THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; CAROL M.
BROWNER, as Administrator of the
U.S. Environmental Protection
Agency,
Defendants.

Appeals from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., Chief District Judge.
(CA-94-11-5)

Argued: November 30, 1999

Decided: March 27, 2000

Before WILKINS and NIEMEYER, Circuit Judges, and
Margaret B. SEYMOUR, United States District Judge
for the District of South Carolina, sitting by designation.

_____

2

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkins and Judge Seymour joined.

_____

## COUNSEL

**ARGUED:** Charles Edward Bachman, O'SULLIVAN, GRAEV & KARABELL, L.L.P., New York, New York, for Appellant. Janet J. Henry, PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P., Columbus, Ohio, for Appellees. **ON BRIEF:** THORP, REED & ASSOCIATES, Wheeling, West Virginia; ROBINSON, SILVERMAN, PEARCE, ARONSOHN & BERMAN, L.L.P., New York, New York, for Appellant. Robert L. Brubaker, PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P., Columbus, Ohio; Michael B. Victorson, ROBINSON & MCELWEE, L.L.P., Charleston, West Virginia; Daniel W. Kemp, AMERICAN ELECTRIC POWER SERVICE CORPORATION, Columbus, Ohio, for Appellees.

_____

## OPINION

NIEMEYER, Circuit Judge:

This is an action brought under the Clean Air Act by an industrial consumer of electric power to obtain rights to valuable pollution emissions allowances allocated by the Environmental Protection Agency for the Kammer Generating Station, near Moundsville, West Virginia. Ormet Corporation, an aluminum manufacturer, sued Ohio Power Company, an electric utility, as well as affiliated companies and personnel and the Administrator of the Environmental Protection Agency, claiming that because of their contractual arrangement with respect to the Kammer plant, Ormet became a joint owner of the plant under the Clean Air Act, and is therefore entitled to a proportionate amount of the pollution emissions allowances.

On cross-motions for summary judgment the district court concluded that, under the Clean Air Act, the contractual arrangement between Ormet and Ohio Power did not make Ormet a joint owner of the Kammer plant and that Ormet was therefore not entitled to a

proportionate share of the pollution emissions allowances allocated to the plant. Accordingly, the court entered summary judgment against Ormet. For the reasons that follow, we affirm.

I

Ormet Corporation manufactures primary aluminum at its plant near Hannibal, Ohio. Electricity is its single greatest "raw material" cost in its production of aluminum. Indeed, the Hannibal facility consumes as much electricity each day as does the city of Pittsburgh.

To secure electrical power for its Hannibal facility, in 1957 Ormet entered into a series of agreements with Ohio Power. Under those agreements, three power-generating units were constructed at the Kammer Generating Station near Moundsville, West Virginia, with Ormet becoming the owner of two of the units and Ohio Power becoming the owner of the third. The parties agreed to an undivided ownership of the plant's common areas in proportion to their ownership of the units.

As Ormet's power needs grew, it looked to Ohio Power for assurances that Ohio Power would supply power even beyond the capacity of the Kammer Generating Station. Accordingly, in December 1966, Ormet and Ohio Power revised their arrangement and executed a new contract, entitled "Power Agreement." Under this 1966 Power Agreement, Ohio Power acquired all of Ormet's ownership interest in the Kammer Generating Station and, at the same time, agreed to supply Ormet with its requirements for power at prices defined by contractually specified formulas. The 1966 Power Agreement had a 25-year term with an option for a 5-year extension, which Ormet exercised in 1991.

Upon the enactment in 1990 of Title IV of the Clean Air Act, 42 U.S.C. §§ 7651-7651o, which created the Acid Rain Program, pollution emissions rights associated with specified fossil fuel-fired combustion plants in the United States, including the Kammer Generating Station, became a valuable commodity. In 1994, Ormet filed this action under the Clean Air Act seeking a declaratory judgment that, in view of its contractual relationship with Ohio Power, it owned a proportionate share (89%) of those rights allocated to the Kammer

4

plant. Ormet alleged that these rights had a value in excess of $40 million.

On defendants' motion challenging the district court's subject matter jurisdiction, the district court dismissed Ormet's complaint. The court interpreted Ormet's claim as a challenge to the acid rain permit issued to Ohio Power by the Environmental Protection Agency ("EPA"), and therefore as a "collateral attack on the EPA's decision to allocate allowances to the private defendants." The court held that Ormet's exclusive avenue to review the EPA's decision was through § 307 of the Clean Air Act, which lodges review of final EPA action exclusively in the United States Courts of Appeals. The district court thus concluded that it lacked subject matter jurisdiction to entertain Ormet's suit. On appeal from that decision, we concluded that Ormet's complaint raised sufficiently substantial federal questions under the Clean Air Act to justify invoking the district court's federal-question jurisdiction, conferred by 28 U.S.C. § 1331. Accordingly, we vacated the district court's dismissal order and remanded this case for disposition on the merits. See Ormet Corp. v. Ohio Power Co., 98 F.3d 799 (4th Cir. 1996).

On cross-motions for summary judgment, the district court interpreted the 1966 Power Agreement between Ormet and Ohio Power in light of the Clean Air Act's requirements and held that Ormet did not have an ownership interest in the Kammer plant. Accordingly, the court concluded, Ormet was not entitled to a proportionate share of the EPA's allowances for pollution emissions allocated to the plant. More particularly, the district court concluded that the 1966 Power Agreement did not make Ormet a part owner because Ormet did not purchase power under a "life-of-the-unit, firm power contractual arrangement" as defined by § 402(27) of the Clean Air Act, 42 U.S.C. § 7651a(27). The court held that

> because the Power Agreement does not entitle Ormet to a "specified amount or percentage of capacity in associated energy generated by a specified generating unit (or units)," the Power Agreement is not a "life-of-the-unit, firm power contractual arrangement."

5

Accordingly, it granted summary judgment in favor of the remaining defendants, Ohio Power and an affiliated company, American Electric Power Service Corporation. These appeals followed.

II

Because an understanding of the statutory scheme is necessary to an understanding of our holding, we provide a general outline of the relevant provisions of the Clean Air Act.

Title IV of the Clean Air Act, enacted as part of the Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399, established the Acid Rain Program. The Act prescribes limits for emissions of sulphur dioxide and nitrogen oxides from specified electric utility plants in the contiguous 48 states, including the Kammer Generating Station. See 42 U.S.C. §§ 7651c, 7651d. It requires that owners or operators of fossil fuel-fired combustion devices, referred to as "units," obtain emissions permits from the EPA for each location or "source" where units exist. See 42 U.S.C. § 7651g. Each permit allocates to each unit a number of emissions "allowances" authorized for the location, and each allowance authorizes the holder to emit one ton of sulphur dioxide. See 42 U.S.C. §§ 7651g(a), 7651a(3). The Act provides that these emissions allowances may be bought and sold as any other commodity. See 42 U.S.C. § 7651b(b); 101 Cong. Rec. S16980 (daily ed. Oct. 27, 1990) (statement of Sen. Moynihan) ("[A]llowances will be treated in part like economic commodities").

By establishing a system of marketable allowances, the Act intends to harness the power of market forces to ensure that emissions reductions are achieved efficiently. A holder of allowances who addresses pollution emissions and reduces them below the levels authorized at its unit may sell the excess allowances to the owner of some other unit who has need of greater emissions authority. The transferability of allowances in a market setting is expected to create incentives for aggressive and innovative efforts to control pollution.

To address the problem of joint plant ownership, the Act contains a multiple-owners provision which provides that allowances allocated to a jointly owned unit "will be deemed to be held or distributed in proportion to" each owner's share of the unit. 42 U.S.C. § 7651g(i).

6

Joint ownership is defined to encompass several types of relationships, including multiple holders of title to an affected unit, lessors and lessees of an affected unit, and situations "where a utility or industrial customer purchases power from an affected unit (or units) under life-of-the-unit, firm power contractual arrangements." 42 U.S.C. § 7651g(i). A life-of-the-unit arrangement is specifically defined in the Act. See 42 U.S.C. § 7651(a)(27).

In this case, Ormet contends that under the 1966 Power Agreement, it was a joint owner of the Kammer units because it purchased power from the Kammer units under a "life-of-the-unit" contractual arrangement. It therefore claims that it is entitled to pollution allowances in proportion to its ownership interest under 42 U.S.C.§ 7651g(i) (defining multiple-ownership rights) and § 7651(a)(27) (defining a life-of-the-unit contractual arrangement).

With this background, we now address Ormet's specific claim.

III

In order for Ormet to prevail on its claim that it is entitled to an 89% proportionate share of the Kammer units' allowances under 42 U.S.C. § 7651g(i) (providing for apportionment of allowances when units are jointly owned), it must demonstrate that its 1966 Power Agreement with Ohio Power amounts to a "life-of-the-unit, firm power contractual arrangement" as specified in the Act. The Act defines such an arrangement as follows:

> The term "life-of-the-unit, firm power contractual arrangement" means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of capacity and associated energy generated by a specified generating unit (or units) and pays its proportional amount of such unit's total costs, pursuant to a contract either --
>
> (A) for the life of the unit;
>
> (B) for a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or

7

(C) for a period equal to or greater than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit was built, with option rights to purchase or re-lease some portion of the capacity and associated energy generated by the unit (or units) at the end of the period.

42 U.S.C. § 7651a(27).

This definition can be distilled into four elements, all of which a power sales agreement must satisfy in order for the customer to be considered a joint owner under the Act: (1) the customer must have reserved or been entitled to receive a specified amount or percentage of capacity and associated energy; (2) the energy must be generated by a specified generating unit or units; (3) the agreement must require the customer to pay "its proportional amount" of the total costs of the specified unit or units; and (4) the arrangement must be for a substantial length of time relative to the life of the unit, as specified in the Act. Thus, the Act recognizes joint ownership only where a power sales agreement provides for both a firm reservation of electrical power from a specific unit and a proportionate division of the operating costs of that unit. On the other hand, to the extent that such an agreement guarantees a customer's power requirements from any source, without imposing on that customer the risk of loss of that power from a particular unit, joint ownership is contraindicated.

We now apply these four statutory requirements to the 1966 Power Agreement to determine whether it provides for joint ownership.

A

The first requirement is that, under the 1966 Power Agreement, Ormet must have reserved or been entitled to receive a "specified amount or percentage of capacity and associated energy."

Under the 1966 Power Agreement, Ohio Power was obliged to "deliver or cause to be delivered energy in amounts required by Ormet" up to an amount designated as the "Ormet Firm Power Reservation."

8

The Ormet Firm Power Reservation could not be lower than 465,000 kilowatts in the first year of the Power Agreement or lower than 475,000 kilowatts for the remaining years. Ormet could increase the Ormet Firm Power Reservation by specified increments up to a maximum of 575,000 kilowatts. During the period covered by the Power Agreement, the Ormet Firm Power Reservation actually ranged from 465,000 kilowatts to 536,000 kilowatts.

Ormet contends that its right to receive the Ormet Firm Power Reservation, even though specified as a range, serves to "specify an amount or percentage of capacity" of the three Kammer units. Ormet points out that the Ormet Firm Power Reservation did not fluctuate during the period between 1990, when the Acid Rain Program was created, and 1996, when the Power Agreement expired, but remained static at 536,000 kilowatts. Ohio Power contends, on the other hand, that the large magnitude of the range specified in the Power Agreement and the limited notice needed to make adjustments in the reservation amount suggest that the Ormet Firm Power Reservation was not a reservation of capacity, but a requirements provision that assured Ormet of a supply of energy, regardless of available capacity, consistent with Ormet's varying production needs. Ohio Power also points out that the Ormet Firm Power Reservation was not tied to the capacity of the Kammer units themselves but that Ohio Power's obligation to supply power was expressed in terms of the "amounts required by Ormet," thus suggesting further that the Power Agreement functioned as a requirements contract, not a contract allocating the risks of ownership between the parties.

While we agree with Ohio Power that the structure of the reservation arrangement indicates that it was not intended merely to divide the available capacity of the Kammer units between Ormet and Ohio Power -- an aspect of the arrangement that we address in subpart B, below -- we nevertheless conclude that the Power Agreement may have substantially satisfied the first element, particularly when taking the element in isolation. When we consider this first element in connection with the requirement that the power must be generated by "a specified unit," however, we reach a different result.

B

The second statutory requirement is that the energy must have been generated by a specified unit or units, i.e., the three Kammer units. In

9

arguing that the energy that it was entitled to receive was to be generated by the Kammer units, Ormet relies heavily upon the fact that the 1966 Power Agreement is replete with references to the Kammer units. However, this fact, by itself, does not persuade us that the arrangement satisfies the second statutory requirement.

First, the 1966 Power Agreement was a contract that transferred Ormet's ownership interest in the Kammer units to Ohio Power, and it is therefore not surprising that references to these units would appear in such a contract. Moreover, the references to Kammer appear mainly in § 3 of the Power Agreement, related to pricing, not in the section addressing Ohio Power's obligations to supply the reserved amount of energy. In § 2 of the Agreement, which governs Ohio Power's supply obligations, Ormet can point to only three terms that are linked to the Kammer plant -- "Point of Delivery," "Ormet Metering Point Demand," and "Ormet Firm Power Reservation." But these terms are linked to the Kammer plant only insofar as their definitions make reference to the metering point, which is located on the grounds of the Kammer facilities. This is of little consequence, because all of the energy supplied to Ormet, whether from the Kammer units or from another Ohio Power source, passed through and was measured at the metering point.

Addressing more directly the requirement that power be generated by a specific unit, the 1966 Power Agreement clearly contemplated that the power delivered to Ormet could be generated anywhere in the Ohio Power system. Ohio Power's obligation to supply the reserved amount would not be diminished if the Kammer units were inoperable. On the contrary, Ohio Power was permitted to reduce the amount of energy it supplied only when an "emergency condition" occurred with respect to the generating capability of the entire Ohio Power system, and even then, Ohio Power was required to "expeditiously use its best efforts" to obtain power from other electric power companies in order to satisfy Ormet's needs.

Ormet argues that some provision for backup power is a necessary element of any "firm power" agreement. But the requirement to supply power from other Ohio Power sources (and to use best efforts to obtain power from other suppliers) extended also to the portion of the

10

reserved amount that was to be furnished on a <u>non-firm</u> basis after the 1966 Power Agreement was amended in 1969.

Because the 1966 Power Agreement did not tie Ohio Power's supply obligations to a "specified generating unit (or units)," Ohio Power bore the entire risk of loss of capacity at the Kammer units. This risk is an important burden of ownership, one that the 1966 Power Agreement imposed exclusively on Ohio Power. As a consequence, Ormet fails to establish this essential statutory requirement for demonstrating shared ownership.

C

To fulfill the third statutory requirement for establishing a joint ownership arrangement, Ormet must demonstrate that the 1966 Power Agreement required it to pay a "proportional amount of the [Kammer units'] total costs." Ormet contends that this requirement is satisfied so long as its payments are stated as a proportion of the plant's total costs. Under Ormet's interpretation, the proportion of costs need not correspond to the percentage of capacity it reserved.

The applicable statutory provision for establishing shared ownership requires in part that the power customer must "reserve[ ] . . . a specified amount or percentage of capacity and associated energy generated by a specified generating unit . . . and pay[ ] its proportional amount of such unit's total costs." 42 U.S.C. § 7651a(27). Because these statutory criteria are intended to define a shared ownership, the provisions make sense only if the percentage of plant capacity reserved by the customer corresponds to the percentage of costs born by that customer. If two parties divided the entitlement to a plant's capacity 50-50, it would hardly be indicative of ownership if one party bore only 5% of the plant's costs. The grammatical structure of this enactment confirms our interpretation. It requires that the customer <u>reserve a specified amount or percentage</u> of a plant's capacity and <u>pay "its proportional amount"</u> of the plant's costs. The antecedent for "proportional amount" is the reserved "amount or percentage of capacity." If this were not so, then any proportional amount would suffice, undermining the need to use the word "proportional" at all.

This construction of the statute can come as no surprise to Ormet, for it advanced this very interpretation in ¶ 25(c) of its complaint,

11

where it alleged as follows: "Ormet <u>agreed to pay a proportional amount of the total costs</u> associated with the three units at the Kammer facility <u>based upon the capacity of the Kammer facility that Ormet reserved</u> and the electric power generated by the Kammer facility that Ormet was entitled to receive." (Emphasis added). Similarly, on Ormet's first appeal, we characterized its complaint in this case as seeking a declaratory judgment that it owned 89% of the allowances issued for the Kammer plant because it was contractually obligated to pay a similar proportion of its costs. <u>See Ormet v. Ohio Power Co.</u>, 98 F.3d 799, 801 (4th Cir. 1996).

A review of the 1966 Power Agreement reveals that Ormet did not undertake to pay a proportionate share of the Kammer units' total costs. Rather, it agreed on the payment of various costs in relation to its reservation of power, based on Kammer's historical costs, whether or not power was produced at the Kammer units. While the costs are specified under extraordinarily elaborate pricing mechanisms, they are never stated as a function of the Kammer unit's total costs.

For example, Ormet agreed to pay "Demand Charges," which were fixed charges for capital expenses based on the depreciated value of the Kammer units as of 1966. These fixed charges did not vary directly with the amount of power Ormet reserved and were subject to adjustment only to account for capital improvements associated with the installation of pollution controls. Consequently, Ohio Power asserts, Ormet was not required to pay, and did not pay, for any percentage of other capital improvements over the years, which Ohio Power contends have totaled $60 million. Although Ohio Power's contention remains undisputed in the record, Ormet asserts in its brief that it will be prepared to contest Ohio Power's contention at trial.

Ormet was also responsible for paying "Energy Charges," which were computed using a formula that took into account variations in the amount of power reserved by Ormet. The Ormet Firm Power Reservation in effect for any given month was used to calculate the Ormet Total Contract Demand amount. This amount was then divided by the contractually defined generating capacity of the Kammer units to obtain the Ormet Power Ratio. Ormet relies on the use of the Ormet Power Ratio in computing the Energy Charges to argue that these charges were proportional to Ormet's contractual reservation. How-

12

ever, Ormet was permitted unilaterally to "curtail" the Ormet total contract demand when there was reduced market demand for aluminum product or for reasons of force majeure. Ormet availed itself of this option, and when it did so, its payment obligations for that period became detached from the Ormet Firm Power Reservation, so that the payments bore no proportional relationship to the reserved amount of energy.

Ormet's cost-payment obligations were limited in another respect as well. When the Kammer units exceeded a pre-set "net heat rate," expressed as a ratio of British Thermal Units to kilowatt-hours, Ormet's payments were adjusted so that it would not bear a proportionate share of the higher fuel costs. In effect, this provision shifted to Ohio Power the risk of less efficient conversion of heat to energy (which could be the result of pollution compliance efforts). This heat-rate adjustment provision resulted in the exclusion of actual fuel costs from the calculation of Ormet's bills during the 1990s, an exclusion that Ohio Power contends amounted to more than $1 million.

Under these pricing provisions, Ormet's share of the costs of operating the Kammer units did not vary in proportion to its reservation of energy and did not bear a consistent relation to the total costs incurred by Ohio Power in operating the Kammer units. Therefore, the 1966 Power Agreement does not meet the requirement that Ormet be required to pay "its proportional amount" of the Kammer units' total costs as required by 42 U.S.C. § 7651a(27).

D

Finally, Ormet must satisfy a durational requirement in one of three ways specified by the statute. See 42 U.S.C. § 7651a(27)(A)-(C). It contends that the 1966 Power Agreement was in effect for a period of 30 years, thus satisfying the requirement of 42 U.S.C. § 7651a(27)(B).

Ohio Power argues that because the 1966 Power Agreement was amended in 1969, the first three years of its term were governed by provisions different from those applicable after 1969, which are discussed in this opinion. Accordingly, Ohio Power argues that the Power Agreement should not be deemed to meet the 30-year dura-

13

tional requirement of § 7651a(27)(B) unless both the pre-1969 and post-1969 provisions of the Agreement satisfy the other statutory criteria.

Whether the Power Agreement's pre-1969 terms and post-1969 terms are materially different is a question that we need not resolve here because we have already determined that the 1966 Power Agreement, as it existed after 1969, does not satisfy at least two of the definitional requirements of 42 U.S.C. § 7651a(27). Because Ormet (1) did not reserve energy from a specified generating unit and (2) did not pay a proportional amount of the costs of operating such a unit, we conclude that the 1966 Power Agreement was not a "life-of-the-unit, firm power contractual arrangement" within the meaning of §§ 408(i) and 402(27) of the Clean Air Act, 42 U.S.C. §§ 7651g(i), 7651a(27).

Accordingly, we affirm the judgment of the district court -- i.e., that Ormet is not entitled to a proportionate share of the pollution emissions allowances allocated to the Kammer plant.

AFFIRMED

14