216 F.Supp.2d 474 (2002)
In re WIRELESS TELEPHONE RADIO FREQUENCY EMISSIONS PRODUCTS LIABILITY LITIGATION
Pinney, et al.
v.
Nokia, et al. (D.Md.)
Farina
v.
Nokia, et al. (E.D.Pa.)
Gilliam, et. al.
v.
Nokia, Inc., et. al. (S.D.N.Y.)
Gimpelson
v.
Nokia, Inc., et. al. (N.D.Ga.)
Naquin, et. al.
v.
Nokia, Inc., et al. (E.D.La.)
No. MDL 1421. CIV.A. 01-MD-1421.
United States District Court, D. Maryland.
June 21, 2002.
*475 *476 *477 H. Thomas Howell, Howell & Gately, Baltimore, MD, for J. Douglas Pinney.
H. Thomas Howell, Howell & Gately, Baltimore, MD, H. Russell Smouse, Peter G. Angelos, John A. Pica, Jr., Law Offices of Peter G. Angelos, Baltimore, MD, for Patricia S. Colonell.
H. Russell Smouse, Law Offices of Peter G. Angelos, Baltimore, MD, for Francis J. Farina, Garrett J. Naquin.
H. Russell Smouse, Peter G. Angelos, John C.M. Angelos, John A. Pica, Jr., Law Offices of Peter G. Angelos, Baltimore, MD, for Crystall Gilliam, Dimitri Mack.
Michael Weinstock, Weinstock and Scavo PC, Atlanta, GA, for Riedy Gimpelson.
Burton Finkelstein, Tracy Diana Rezvani, Richard Maxwell Volin, Finkelstein Thompson and Loughran, Washington, DC, for Sarah Dahlgren.
Carl B. Hilliard, Jr., Law Offices of Carl B. Hilliard, Jr., Del Mar, CA, Adam Gonnello, Farugi and Farugi, New York, NY, for Gibb Power, Kim Brower.
John B. Isbister, Tydings and Rosenberg, LLP, Baltimore, MD, Steven M. Zager, Austin Tighe, Brobeck Phleger and Harrison LLP, Austin, TX, for Nokia, Inc., Samsung Electronics America, Inc.
James P. Ulwick, Kramon and Graham, Baltimore, MD, Brian P. Quirk, James B. Irwin, Irwin Fritchie Urquhart and Moore, LLC, New Orleans, LA, for NEC America, Inc.
Gregg L. Bernstein, Denis J. Charlesworth, Martin Snyder and Bernstein, PA, Baltimore, MD, David T. Moran, Charles L. Babcock, Ryan C. Wirtz, Jackson Walker, LLP, Dallas, TX, for Ericsson Wireless Communications, Inc.
Paul S. Schleifman, Shook Hardy and Bacon, LLP, Washington, DC, J. Stan Sexton, Michael D. Moeller, Shook Hardy and Bacon, LLP, Kansas City, MO, for Sprint PCS Ltd. Partnership.
Mark H. Kolman, Leslie R. Cohen, Dickstein Shapiro Morin and Oshinsky LLP, Washington, DC, for Audiovox Communications Corp.
Sheila L. Birnbaum, Skadden Arps Slate Meagher and Flom, LLP, New York, NY, Patrick R. Buckler, Baltimore, MD, Edward M. Crane, David L. Hanselman, Jr., Skadden Arps Slate Meagher and Flom, Chicago, IL, Ronald M. Cherry, Law Offices of Ronald M. Cherry, Towson, MD, for Nextel Communications, Inc.
Paul D. Krause, Laura Nachowitz Steel, Wilson Elser Moskowitz Edelman and Dicker, LLP, Washington, DC, for Matsushita Corp. of America.
Raymond B. Biagini, Ray M. Aragon, McKenna Loing and Aldridge LLP, Washington, *478 DC, for Philips Electronic North America Corp.
George C. Doub, Jr., William H. Murphy, Jr., George C. Doub, III, William H. Murphy, III, George C. Doub, PC, Baltimore, MD, Francis A. Citera, Greenberg Traurig, PC, Chicago, IL, for Qualcomm Inc., Sony Electronics, Inc.
Paul D. Krause, Wilson Elser Moskowitz Edelman and Dicker, LLP, Washington, DC, Andrew M. Winick, Brown Diffenderffer and Kearney, LLP, Baltimore, MD, for Sanyo North America, Inc.
Antonia B. Ianniello, Stephen Anthony Fennell, Thomas M. Barba, Jennifer Quinn Barabanov, Mark F. Horning, Stewart A. Baker, Steptoe and Johnson, LLP, Washington, DC, for AT&T Corp.
Paul F. Strain, Venable Baetjer and Howard, LLP, Baltimore, MD, M. King Hill, III, Venable Baetjer and Howard, LLP, Towson, MD, Laura Owens, Jane Fugate Thorpe, Scott Elder, Alston and Bird, LLP, Atlanta, GA, for Verizon Maryland, Inc.
John Henry Lewin, Jr., Paul F. Strain, Venable Baetjer and Howard, LLP, Baltimore, MD, M. King Hill, III, Venable Baetjer and Howard, LLP, Towson, MD, Laura Owens, Jane Fugate Thorpe, Scott Elder, Alston and Bird, LLP, Atlanta, GA, for VeriOn Communications, Inc., Verizon Wireless.
John Henry Lewin, Jr., Venable Baetjer and Howard, LLP, Baltimore, MD, M. King Hill, III, Venable Baetjer and Howard, LLP, Towson, MD, Laura Owens, Jane Fugate Thorpe, Scott Elder, Alston and Bird, LLP, Atlanta, GA, Biran Brooks, O'Melveny and Myers, LLP, Washington, DC, for Cellco Partnership.
Thomas C. Watson, Curtis S. Renner, Watson and Renner, Washington, DC, for Cingular Wireless, LLC, Cingular Wireless.
Richard Alan Dean, Arter and Hadden, LLP, Washington, DC, Charles L. Perry, Arter and Hadden, LLP, Dallas, TX, for Cellular One Group.
Charles P. Goodell, Jr., James A. Frederick, Goodell DeVries Leech and Dann, LLP, Baltimore, MD, Eugene A. Schoon, Tamar B. Kelber, James W. Mizgala, Sidley Austin Brown and Wood, Chicago, IL, for Voicestream Wireless Corp.
John J. Nagle, III, Winn C. Friddell, Bodie Nagle Dolina Smith and Hobbs, PA, Towson, MD, Elwood E. Swam, Hampstead, MD, for C.E.I., Inc.
Maureen E. Murphy, Murphy and Murphy, Baltimore, MD, for Baltimore Business Communications, Inc.
Seamus C. Duffy, Drinker, Biddle & Reath, P.H., Philadelphia, PA, for Comcast/Metrophone.
John A. Stewart, Jr., Hulse and Wanek, New Orleans, LA, Mark J. Jeansonne, Milling Benson Woodward, New Orleans, LA, for Radiofone.
Michael E. Yaggy, Kenneth L. Thompson, Anthony Michael Conti, Piper Rudnick, LLP, Baltimore, MD, for Motorola, Inc.
Colleen A. Hartman, Daniel S. Reinhardt, Steven J. Hewitson, Troutman Sanders, LLP, Atlanta, GA, for Southern Telecom, Inc.
Eugene A. Schoon, Sidley Austin Brown and Wood, Chicago, IL, for Powertel, Inc., Powertel PCS, Inc., Powertel/Atlanta, Inc.
William D. Barwick, Elizabeth W. Boswell, James A. Orr, Alana Black Zielinski, Sutherland Asbill and Brennan, LLP, Atlanta, GA, Alexander X. Jackins, Washington, DC, for MCI Worldcom Communications, Inc.
Kevin B. Getzendanner, Matthew T. Covell, Arnall Golden Gregory, LLP, Atlanta, GA, for Mitsubishi wireless Communications Inc.
*479 Paul F. Strain, Venable Baetjer and Howard, LLP, Baltimore, MD, Jane Fugate Thorpe, Alston and Bird, LLP, Atlanta, GA, John Beisner, O'Melveny and Myers, LLP, Washington, DC, for Verizon Communications, Inc.
Steven M. Laduzinsky, Scott A. Hanfling, Kane Laduzinsky and Mendoza, Ltd., Chicago, IL, for Cellular Telecommunications and Internet Ass'n.
Ralph A. Taylor, Jr., Bruce Kenneth Trauben, Dorsey and Whitney, LLP, Washington, DC, for Institute of Electrical and Electronics Engineers, Inc.

MEMORANDUM
BLAKE, District Judge.
The plaintiffs in this multidistrict litigation have brought five class actions against defendants in the states of Maryland, Pennsylvania, New York, Georgia, and Louisiana. Each count of each complaint is brought, on its face, under state statutory or common law.[1] Asserting federal jurisdiction under several theories, the defendants filed notices of removal under 28 U.S.C. § 1441(b) in all five actions. The Judicial Panel on Multidistrict Litigation transferred the cases to this court. Now pending is plaintiffs' consolidated and renewed motion for remand pursuant to 28 U.S.C. § 1447(c). The issues have been fully briefed, and a hearing was held on February 15, 2002. For the reasons set forth below, the plaintiffs' motion will be denied.
Plaintiffs purport to represent all cell phone purchasers who have not been diagnosed with brain-related diseases, and who were not provided with headsets when they purchased or leased their telephones. They allege that defendants have negligently and fraudulently endangered the consuming public by providing wireless phones without headsets, knowing that these phones emit unsafe levels of radio frequency ("RF") radiation. Rather than seek a traditional tort or contract remedy on behalf of this strangely defined class, however, plaintiffs ask their respective state courts to: (1) declare wireless phones that are in compliance with the FCC's safety regulations on radio frequency emissions "unreasonably dangerous" under state law when sold without headsets; (2) enjoin defendants from selling FCC-compliant wireless phones without headsets; (3) order defendants to provide free headsets to all wireless telephone users; and (4) order defendants to provide "warnings" to consumers about the "dangers" of using FCC-compliant phones. As illustrated by the relief requested, the plaintiffs' suits, though couched in the language of state tort and contract law, have only one goal to challenge in state court the validity and sufficiency of the federal regulations on radio frequency radiation from wireless phones. Because plaintiffs' suits are a disguised attack on federal law in an area of national importance, the court will exercise jurisdiction over plaintiffs' claims.

I. REMOVAL JURISDICTION
State court actions which originally could have been filed in federal court may be removed to federal court by the defendant pursuant to 28 U.S.C. § 1441. Caterpillar v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); Mulcahey v. Columbia Organic Chemicals Company, Inc., 29 F.3d 148, 151 (4th Cir.1994). *480 Section 1441 provides, in pertinent part, that "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441. Absent diversity of citizenship, the propriety of removal under § 1441 depends on whether the action is one "arising under the Constitution, laws, or treaties of the United States," as set forth by 28 U.S.C. § 1331. Mulcahey, 29 F.3d at 151; Rosciszewski v. Arete Associates, Inc., 1 F.3d 225, 230 (4th Cir.1993).
As the Fourth Circuit has explained:
In order to determine if an action arises under federal law, we must apply the well-pleaded complaint rule. See Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). This rule `provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.' Id. Because `[t]he well-pleaded complaint rule applies to the original jurisdiction of the district courts as well as to their removal jurisdiction,' Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal., 463 U.S. 1, 10 n. 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), a plaintiff `may avoid federal jurisdiction by exclusive reliance on state law' in pleading its case, Caterpillar, Inc., 482 U.S. at 392, 107 S.Ct. 2425.
Rosciszewski, 1 F.3d at 231; see also J.H.W. Sr., Inc. v. Exxon Co., U.S.A., 921 F.Supp. 1436, 1438 (D.Md.1996).
Ordinarily, therefore, the plaintiff as "the master of his complaint" may select a state forum by choosing to rely on state law claims only, even if the facts alleged also would support a claim under federal law. See Franchise Tax Bd., 463 U.S. at 22, 103 S.Ct. 2841; Cheshire v. Coca-Cola Bottling Affiliated, Inc., 758 F.Supp. 1098, 1100 (D.S.C.1990). While a district court should be cautious in denying defendants access to a federal forum because remand orders are generally unreviewable, see Cheshire, 758 F.Supp. at 1100; CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER 14B FED. PRAC. & PROC. JURIS.3D § 3721 at 351-52 (2002), it is also true that removal jurisdiction raises "significant federalism concerns," and therefore must be strictly construed. Mulcahey, 29 F.3d at 151 (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941)). The burden of establishing federal jurisdiction is on the party seeking removal. Id. (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921)). "If federal jurisdiction is doubtful, a remand is necessary." Id. (citing In re Business Men's Assur. Co. of America, 992 F.2d 181, 183 (8th Cir.1993)); see also Cheshire, 758 F.Supp. at 1102.
Recognizing that the complaint does not on its face allege any federal claims, the defendants seek to invoke three removal doctrines to support federal question jurisdiction: "substantial federal question," "artful pleading," and "complete preemption."[2] The defendants also maintain that, in complying with the FCC's regulations on RF emissions from wireless phones, *481 they were "acting under" a federal officer for purposes of 28 U.S.C. § 1442. The court will address each of defendants' removal arguments in turn.

II. SUBSTANTIAL FEDERAL QUESTION JURISDICTION
"Congress has given the lower federal courts jurisdiction to hear `only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" Interstate Petroleum Corp. v. Morgan, 249 F.3d 215, 219 (4th Cir.2001) (en banc) (quoting Franchise Tax Bd., 463 U.S. at 27, 103 S.Ct. 2841); see also Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 606-07 (4th Cir.2002). As this court recognized in Maryland v. Philip Morris Inc., 934 F.Supp. 173, 178 (D.Md.1996), the fact that questions of federal law may need to be determined during the course of state litigation is insufficient to confer federal question jurisdiction under the substantial federal question doctrine. Rather, "the existence of federal question jurisdiction must be determined by `principled, pragmatic distinctions,' and `careful judgments about the exercise of federal judicial power'; only where the `federal interest at stake' is substantial will federal jurisdiction lie." Custer v. Sweeney, 89 F.3d 1156, 1168 (4th Cir.1996) (quoting Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 813-14, 814 n. 12, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986)). "[T]he proper test for federal jurisdiction [is] `the degree to which federal law must be in the forefront of the case and not collateral, peripheral or remote.'" Mulcahey, 29 F.3d at 152 (quoting Merrell Dow, 478 U.S. at 813 n. 11, 106 S.Ct. 3229).
While "the mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction,"[3]Merrell Dow, 478 U.S. at 813, 106 S.Ct. 3229, there are a limited number of cases which depend on the resolution of a federal question sufficiently substantial to arise under federal law. Merrell Dow, 478 U.S. at 808-09, 106 S.Ct. 3229; Ormet Corp. v. Ohio Power Co., 98 F.3d 799, 806 (4th Cir.1996) (citing Franchise Tax Bd., 463 U.S. 1, 27-28, 103 S.Ct. 2841); Mulcahey, 29 F.3d at 151. Generally, when "`the right set up by [a] party may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction,' jurisdiction can be had in federal courts." Ormet, 98 F.3d at 806 (quoting Osborn v. Bank of United States, 22 U.S. (9 Wheat) 738, 822, 6 L.Ed. 204 (1824)). In reaching such a determination, the Supreme Court has consistently instructed federal courts to make "sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow, 478 U.S. at 810, 106 S.Ct. 3229.[4]
*482 The defendants argue that removal is warranted because the plaintiffs' claims will require the resolution of substantial questions of federal law under the Federal Communications Act of 1934 ("FCA"), 47 U.S.C. § 151, et. seq. The court agrees. In the FCA, Congress explicitly instructed the FCC to set national standards regulating the levels of radio frequency emitted from telecommunication facilities. Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (1996), § 704(b). As a result, after notice and lengthy public proceedings, the FCC promulgated safety regulations that clearly and specifically delineate the levels of RF emissions that will be allowed from wireless phones:
Limits for General Population/ Uncontrolled exposure: 0.08 W/kg as averaged over the whole-body and spatial peak SAR not exceeding 1.6 W/kg as averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the hands, wrists, feet and ankles where the spatial peak SAR shall not exceed 4 W/kg, as averaged over any 10 grams of tissue (defined as a tissue volume in the shape of a cube).
47 C.F.R. 2.1093(d)(2). Defendants must comply with the RF safety requirements in 47 C.F.R. 2.1093(d)(2) in order to make their phones available to the public.
In determining whether plaintiffs' claims necessarily depend on substantial issues of federal law, the court must consider the allegations made and relief requested in plaintiffs' complaints. Before doing so, however, the court will discuss the comprehensive nature of federal regulation of *483 wireless service to put the matter before it in context.

1. Federal Regulation of RF Emissions from Wireless Phones
Congress asserted federal control over all interstate wire and radio communications systems and established the Federal Communications Commission ("FCC" or "the Commission") as the sole authority for licensing radio facilities and regulating the technical aspects of radio communications in the Federal Communications Act of 1934 ("FCA"), 47 U.S.C. § 151. See In re An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems, 86 F.C.C.2d 469, ¶ 80, 1981 WL 158543 (1981) (Def. Appendix, Tab 1) (hereinafter "Cellular Communications Systems") ("In enacting such legislation Congress has determined that overall management of the radio spectrum and the licensing of radio facilities are areas within the exclusive jurisdiction of the Federal government."). Pursuant to this exclusive authority, the FCC has issued licenses and set the technical standards for wireless telecommunications since the inception of commercial wireless telephone service. See Cellular Communications Systems, ¶¶ 86-115; 47 C.F.R. § 20.3. The FCC currently licenses all equipment used to provide wireless service, including wireless hand-held telephones, and regulates the radiated power levels from all licensed devices, both stationary and portable. 47 C.F.R. §§ 2.901, 1.1307, 2.1093, 2.1091.
In promulgating licensing and technical rules to govern wireless service, one of the FCC's overriding goals is to design cellular service in a manner that will achieve nationwide compatibility. Cellular Communications Systems, ¶ 79. "In this regard [the FCC] has expressly stated that a cellular subscriber traveling outside of his or her local service area should be able to communicate over a cellular system in another city." Id. Recognizing the danger that piecemeal state regulation might pose to this endeavor, the FCC has established "federal primacy over the areas of technical standards and competitive market structure for cellular service." Id. at ¶¶ 79, 82.[5] The FCC's technical standards are intended to produce "compatible operation of equipment on both local and national levels," and promote "signal quality and other quality aspects of system performance." Cellular Communications Systems, ¶ 84. Thus, regulation of wireless service typically revolves around matters such as the allocation of frequencies, height and power of antenna base stations, and radiation power of mobile units such as wireless phones. Id. at ¶¶ 87-95.
To further encourage the rapid deployment of uniform wireless services, Congress began to develop a system of federal telecommunications regulation in the 1993 amendments to the FCA. See Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 6002, 107 Stat. 312, 387-97 (1993) ("OBRA" or the "1993 Amendments"); In re Petition of the Connecticut Department of Public Utility Control to Retain Regulatory Control of the Rates of Wholesale Cellular Service Providers in the State of Connecticut, 10 F.C.C. Rcd. 7025, ¶¶ 2, 10, 1995 WL 316493 (1995), review denied, 78 F.3d 842 (2d Cir.1996). First, Congress revised Section 2(b) of the Act to exclude wireless services from the prohibition on federal regulation of intrastate communications. See 47 U.S.C. § 152(b). Second, Congress amended 47 U.S.C. § 332 to give the FCC exclusive authority over the regulation of the rates *484 charged by and market entry of mobile service providers. OBRA, § 6002(b)(2)(A), 107 Stat. 312, 394 (1993), codified at 47 U.S.C. § 332(c)(3)(A). Congress intended these changes to "foster the growth and development of mobile services that, by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure." H.R.Rep. No. 111, 103rd Cong., 1st Sess. 260 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 587 (Def. Appendix, Tab 2).
In the Telecommunications Act of 1996 ("FTA" or the "1996 Amendments"), Pub.L. No. 104-104, 110 Stat. 56, Congress revisited the FCA by directly prohibiting state and local regulation of "the placement, construction, and modification of personal wireless service facilities" on the basis of concerns about radio frequency radiation. 47 U.S.C. § 332(c)(7)(B)(iv). As a result,
Pursuant to Section 332(c)(7), and consistent with the Commission's general authority to regulate the operation of radio facilities, State and local governments are broadly preempted from regulating the operation of personal wireless service facilities based on RF emission considerations. Thus, for example, a local government may not require a facility to comply with RF emissions or exposure limits that are stricter than those set forth in the Commission's rules, and it may not restrict how a facility authorized by the Commission may operate based on RF emissions or any other cause.
In re Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934, Report and Order, 15 FCC Red. 22, 821, ¶ 17(2000) (Def. Appendix, Tab 3). According to the relevant Congressional report:
The Committee finds that the current State and local requirements, siting and zoning decisions by non-federal units of government, have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit the deployment of Personal Communications Services (PCS) as well as the rebuilding of a digital technology-based cellular telecommunications network. The Committee believes it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible.
H.R.Rep. No. 104-204, 104th Cong., 2d Sess. 94 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 61 (Def.Appendix, Tab.5). To "insure an appropriate balance in policy," id., Congress instructed the FCC to prescribe rules regarding the environmental effects of radio frequency emissions within 180 days of the enactment of the 1996 Amendments. Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (1996), § 704(c).
While the 1996 Amendments were being debated, the FCC was already in the process of determining whether to update its radio frequency radiation regulations.[6] *485 After notice and an extensive period for the submission of public comment, the FCC issued Release No. 96-326 (the "FCC First Order") on August 1, 1996. See In re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, Release No. 96-326, 11 F.C.C.R. 15123, 1996 WL 926565 (1996) (Def. Appendix, Tab 8.) Release No. 96-326 articulates a specific absorption rate ("SAR") that wireless phones may not exceed,[7] and currently applies to all wireless phones sold in the United States. See 47 C.F.R. §§ 1.1307, 2.1091, 2.1093.[8] According to the FCC, the limits set by Release No. 96-326 are "one fiftieth of the point at which RF energy begins to cause any unhealthful thermal effect." Cellular Phone Taskforce v. FCC, U.S. Sup.Ct. No. 00-393, Brief for the Respondents in Opposition [to Petition for Writ of Certioriari], p. 3 (Dec.2000) (hereinafter "FCC Brief") (Def. Appendix, Tab 4) (citing National Council on Radiation Protection and Measurements, Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields, NCRP Report No. 86, at 279-283 (1986)).
The FCC's RF guidelines have been criticized because of the agency's acknowledged lack of expertise over public health and safety matters. In response, the FCC has stated:
To be sure, the [FCC] `does not have the expertise to make independent judgments on such alleged health effects as `electrosensitivity' or other reported effects on human health. This is the responsibility of the federal health and safety agencies.' RF Reconsideration Order, 12 F.C.C.R. at 13, 538. As the agency acknowledged when it first implemented RF exposure rules, it lacks expertise to `develop our own radiation exposure guidelines,' but `does have the expertise and authority to recognize technically sound standards promulgated by reputable and competent organizations such as ANSI.' 100 F.C.C.2d at 551. Moreover, the FCC consulted extensively with EPA, FDA, OSHA and other federal health and safety agencies, all of which concurred in the final standard. RF Order, 11 F.C.C.R. at 13, 538. EPA in particular had been working on its own set of RF exposure rules and it had extensive familiarity with the scientific and medical literature. Pet.App. A10. In short, the RF regulations culminated from a multi-disciplinary, multi-agency effort in which the FCC took the lead.
FCC Brief, 21-22 (Def. Appendix, Tab 4) (emphasis in original).[9] The FDA's involvement *486 was particularly important because of its authority over radiation emitting products pursuant to the Electronic Product Radiation Control Act. See 21 U.S.C. § 360ii.[10] Under the advisement of the FDA, for example, the FCC declined to adopt the ANSI/ IEEE radiated power exclusion, which would have exempted wireless phones and other low-power devices from having to comply with federal RF safety standards. FCC First Order, ¶¶ 49, 71; FCC Second Order, ¶ 30.[11] The FDA has characterized the RF requirements as "a significant step towards achieving a consensus guideline on RF exposure which will have the support of the federal agencies responsible for protecting the public from nonionizing radiation injury." (Letter from Elizabeth D. Jacobson, Ph.D., Deputy Director for Science, FDA Center for Devices and Radiological Health, to Richard M. Smith, Chief of the FCC Office of Engineering and Technology, dated July 17, 1996 (Def. Appendix, Tab 9).)[12] Thus, the national RF requirements represent an inter-agency collaborative *487 federal effort, mandated by Congress and spearheaded by the FCC, to achieve "a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communication services to readily address growing marketplace demands."[13]FCC Second Order, ¶ 29.

2. Plaintiffs' Claims
To determine whether plaintiffs' right to relief necessarily depends on a substantial federal question, the court must examine the plaintiffs' complaints. In Pinney, plaintiffs acknowledge that defendants are licensed by the FCC to provide wireless phones, and that the phones are manufactured in accordance with these licenses and other information provided by the FCC. (See Pinney at ¶¶ 50-52). Nonetheless, plaintiffs claim that defendants have (1) failed to warn consumers about adverse health risks associated with RF emissions from wireless phones (id., "COUNT ISTRICT PRODUCT LIABILITYFAILURE TO WARN," ¶¶ 88-100); (2) knowingly placed defective and unreasonably dangerous products in the stream of commerce by selling and activating wireless phones without headsets (see Pinney, "COUNT IISTRICT PRODUCT LIABILITYDESIGN OR MANUFACTURING DEFECT," ¶¶ 101-109); (3) engaged in deceptive acts and practices by "making false and misleading oral and written statements" about the safety of wireless phones in violation of Maryland's Consumer Protection Act, Md. Com. Law Code Ann. § 13-101, et. seq. (id., "COUNT III VIOLATIONS OF MARYLAND CONSUMER PROTECTION ACT," ¶¶ 110-114);[14] (4) breached implied warranties of merchantability by knowingly selling and distributing unreasonably dangerous wireless phones (id., "COUNT IVBREACH OF IMPLIED WARRANTIES," ¶¶ 115-121); (5) negligently designed, manufactured, tested, marketed, distributed, and/or sold the wireless phones to the public (id., "COUNT VNEGLIGENCE," ¶¶ 122-133); (6) fraudulently "misinformed, misled, and deceived" consumers into believing in the safety of the wireless phone (id., "COUNT VIFRAUD" and "COUNT VIIFRAUD BY CONCEALMENT," *488 ¶¶ 84, 133-149); and (7) conspired to market unsafe wireless phones by improper and wrongful means (id., "COUNT VIIICIVIL CONSPIRACY," ¶¶ 150-163). In plaintiffs' view, any statements by defendants portraying the phones as "safe" because they comply with FCC standards are fraudulent and deceitful because "the FCC ha[s] declared that it does not consider itself the `expert agency' for evaluating the health effects" of radio frequency radiation. (See id. at ¶¶ 53, 79.) To bolster this position, plaintiffs suggest that such safety "advertisements" have been challenged by the FDA. (Pinney at ¶ 80 (citing Letter from Elizabeth Jacobson, Deputy Director of the Food & Drug Administration's Center for Devices and Radiological Health, dated July 19, 1993).) Plaintiffs further claim that defendants, both individually and collectively, have conspired to exercise improper influence over the American National Standards Institute, the organization responsible for developing the RF safety guidelines upon which the national standards are based. (Id. at ¶¶ 71-75.) These allegations put the validity of the federal regulations, and the process by which they were developed, directly into dispute.
Although none of these claims explicitly challenge the FCC's radiation exposure guidelines, an examination of the class plaintiffs propose and the remedy plaintiffs request reveals that the true gravamen of these complaints is to attack the lack of a headset requirement under the federal RF safety rules. Plaintiffs seek to represent all present and future cell phone users who have not been diagnosed with the injuries wireless phones supposedly generate.[15] (Pinney, "CLASS ACTION ALLEGATIONS," ¶ 42.) The only relief they request is for the court to force defendants to provide them with headsets, either through compensatory damages or prohibitory injunctions.[16] (See Pinney, ¶¶ 100(a)-(h), 109(a)-(h), 114(a)-(g), 121(a)-(g), 133(a)-(h), 142(a)-(h), 149(a)-(h), 163(a)-(h).) Any court faced with such a class and requested *489 remedy necessarily must evaluate whether the FCC has been authorized by Congress to act as the final authority on the regulation of RF emissions from wireless phones, and whether the current RF requirements promulgated by the FCC adequately protect the public's health. Indeed, the FCC has already considered and rejected a headset requirement.[17] Thus, a state imposed headset rule necessarily invalidates the national standard. A suit to invalidate a federal regulation as unreasonable arises under federal law. See Cahnmann v. Sprint Corp., 133 F.3d 484, 488 (7th Cir.1998) ("A tariff filed with a federal agency is the equivalent of a federal regulation, and so a suit to enforce it, and even more clearly a suit to invalidate it as unreasonable under federal law ... arises under federal law.") (citations omitted); see also Marcus, 138 F.3d at 55-56 (upholding removal of a breach of warranty claim against AT & T under the substantial federal question doctrine because the tariff that the claim was based upon had the force of federal law).
The Second Circuit recently rejected a suit to invalidate the FCC's RF regulations in Cellular Phone Taskforce v. FCC, 205 F.3d 82 (2d Cir.2000), cert. denied, 531 U.S. 1070, 121 S.Ct. 758, 148 L.Ed.2d 661 (2001). The similarities between Cellular Phone Taskforce and the present case cannot be ignored. In Cellular Phone Taskforce, two consumer groups challenged the FCC's standards on RF emissions in federal court. These groups contended, as the plaintiffs do here, that the current federal RF regulations do not adequately protect the public from the "non-thermal effects of RF radiation."[18] Instead of requesting a headset, however, plaintiffs in Cellular Phone Taskforce argued that the FCC should have created greater safety margins to account for scientific uncertainty about RF emissions. Id. at 90-91. *490 Characterizing this as "a policy question, not a legal one," id., the Second Circuit remarked:
The FCC concluded that requiring exposure to be kept as low as reasonably achievable in the face of scientific uncertainty would be inconsistent with its mandate to `balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible.' This policy conclusion is neither irrational, arbitrary nor capricious and we decline to disturb it.
Id. at 92.
Congress's primary goal in regulating wireless service is to develop a seamless and ubiquitous national system of wireless communications.
The RF exposure rules govern the activities of entities that are licensed and heavily regulated by the FCC. Congress has charged the FCC with `making available ... a rapid, efficient, Nationwide, and world-wide wire and radio communications service,' 47 U.S.C. 151 (1994 & Supp. IV 1998), has declared it `the policy of the United States to encourage the provision of new technologies and services to the public,' 47 U.S.C. 157(a), and has established procedures to ensure the `efficient and intensive use of the electromagnetic spectrum,' 47 U.S.C. 309(j)(3)(D) (Supp. IV 1998). There is a trade-off between those goals and public exposure to RF energy: all risk from RF energy could be eliminated by prohibiting wireless communications technologies. Congress has entrusted to the FCC the process of striking the appropriate balance, a subject squarely within the agency's expertise.
FCC Brief at 21. The current federal requirements reflect carefully considered judgments by Congress, FCC, FDA, EPA, NIOSH, and OSHA about the appropriate method of balancing these concerns. As the Fourth Circuit recognized in Ormet, "[w]here the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts." Ormet, 98 F.3d at 807 (citing Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 347-48, 4 L.Ed. 97 (1816) (Story, J)).[19] While state courts *491 ultimately might conclude that they are preempted from regulating the wireless industry on the basis of RF concerns, the risk of fifty different states articulating fifty different rules about whether and to what extent they may set RF safety standards could create market instability and prevent the maintenance of an unimpeded national network of rapid and efficient telecommunications service, a goal of significant importance to national commerce and security. With these federal interests figuring so centrally to plaintiffs' case, removal is fully justified.
Removal might not be warranted if plaintiffs could prevail without a court evaluating the validity and sufficiency of the federal standards. "[I]f a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist." Mulcahey, 29 F.3d at 153 (citing Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 811, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)); Danfelt v. Bd. of County Commissioners, Washington County, 998 F.Supp. 606, 609-10 (D.Md. 1998). Here, however, the central premise of each count of each complaint is that federal safety regulations governing wireless hand-held phones permit the sale of a product that is unreasonably dangerous to consumers. The only way a court can resolve this dispute and possibly grant plaintiffs the remedy they seek is for it to pass judgment on the validity of the federal RF standards.[20] Defendants have the *492 right to have such an evaluation take place in federal court. The court will therefore deny plaintiffs' motion to remand.

III. ARTFUL PLEADING
Under the doctrine of "artful pleading," a court is permitted to look behind a complaint to determine whether a plaintiff is attempting to conceal the federal nature of his claim by fraud or obfuscation. Philip Morris Inc., 934 F.Supp. at 175. The application of artful pleading is "most appropriate in cases where federal law altogether preempts and supplants state law, but plaintiff seeks to avoid the effect of preemption by pleading only state causes of action." See id. at 175 (quoting Cheshire v. Coca-Cola Bottling Affiliated, Inc., 758 F.Supp. 1098, 1100 (D.S.C.1990)). In 1998, the Supreme Court stated in Rivet v. Regions Bank of Louisiana: "[T]he artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim." 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912.
Since Rivet, some courts have concluded that artful pleading cannot exist absent complete preemption. See Waste Control Specialists, LLC v. Envirocare of Texas, Inc., 199 F.3d 781, 783 (5th Cir.2000) ("Without complete preemption, the artful pleading doctrine does not apply."); Goepel v. National Postal Mail Handlers Union, 36 F.3d 306, 311 n. 5 (3rd Cir.1994) ("[Complete preemption] has been referred to elsewhere as the `artful pleading' doctrine, under which a court will not allow a plaintiff to deny a defendant a federal forum when the plaintiff's complaint contains a federal claim `artfully pled' as a state law claim.") (citation omitted). Others, including one court within this circuit, have declined to read into Rivet an intention by the Supreme Court to collapse artful pleading and complete preemption into a single rule. See Reveal v. Stinson, 115 F.Supp.2d 688, 690 n. 2 (S.D.W.Va. 2000).
Past precedent indicates that artful pleading requires the presence of either complete preemption or "`a state cause of action the merits of which turn on an important federal question.'" Id. at 690 (citations omitted). As noted in Reveal, it would be inappropriate to assume that the Supreme Court in Rivet overruled sub silentio "a landmark line of cases that have guided the determination of federal jurisdiction for many decades." Reveal, 115 F.Supp.2d at 690 n. 2; see also 14B WRIGHT, MILLER, & COOPER, supra, § 3722 at 447.
Rather than characterizing artful pleading as a separate "removal doctrine," however, the term may more accurately be used to describe the manner in which some plaintiffs, such as those presently before the court, manage to plead claims that are actually federal (because they are either completely preempted, or based entirely *493 on substantial federal questions) under state law. In such cases, a court need not "blind itself to the real gravamen of [the] claim." Philip Morris, 934 F.Supp. at 176 (quoting In re Wiring Device Antitrust Litig., 498 F.Supp. 79, 82 (E.D.N.Y.1980)). Plaintiffs' proposed class represents the same interests as the consumer groups in Cellular Phone Taskforce both sets of plaintiffs are uninjured users of wireless phones seeking stricter limits on radio frequency emissions. Unlike the Cellular Phone Taskforce plaintiffs, however, the plaintiffs in this litigation want reconsideration of the federal standards to occur in state court. In other words, rather than directly attack the federal requirements in the appropriate forum, plaintiffs are attempting to circumvent the FCA's comprehensive regulatory scheme by pursuing stricter safety measures, i.e., the addition of headsets, under state tort law.
Ordinarily, as "masters of the complaint," plaintiffs may plead their claims within the confines of state law, if they so choose. Recognizing the unlikelihood of success in federal court given the Second Circuit's determination in Cellular Phone Taskforce, however, plaintiffs have impermissibly structured this litigation to avoid the uniform determination of RF safety in a federal forum by simultaneously bringing substantially similar actions in a variety of state courts. Plaintiffs may not deny defendants their right to have decisions concerning RF safety made in a federal forum by labeling their claims exclusively under state law in order to conceal the existence of a substantial federal question. Nor may plaintiffs "deliberately obscure[] the true nature of their claims in an attempt to proceed with their action in state court without the restrictions imposed by the comprehensive regulatory scheme embodied in the Communications Act." In re Comcast Cellular Telecommunications Litigation, 949 F.Supp. 1193, 1204 (E.D.Pa.1996) (permitting removal of disguised rate challenge pursuant to artful pleading doctrine). Thus, plaintiffs' artful pleading further warrants this court's decision to exercise jurisdiction.

IV. COMPLETE PREEMPTION
Plaintiffs next argue that removal is proper on the basis of complete preemption. In considering this argument, the court must distinguish between ordinary conflict preemption and complete preemption. As the Fourth Circuit has explained:
Under ordinary conflict preemption, state laws that conflict with federal laws are preempted, and preemption is asserted as `a federal defense to the plaintiff's suit. As a defense it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court.' Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).... In the case of complete preemption, however, Congress `so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character.' Taylor, 481 U.S. at 63-64, 107 S.Ct. 1542. That is to say, the doctrine of complete preemption `converts an ordinary state common law complaint into one stating a federal claim.' Id. at 65, 107 S.Ct. 1542. Thus, the doctrine of complete preemption serves as a corollary to the well-pleaded complaint rule: because the state claims in the complaint are converted into federal claims, the federal claims appear on the face of the complaint. Id. at 63-65, 107 S.Ct. 1542.
Darcangelo v. Verizon Communications, 292 F.3d 181, 187 (4th Cir.2002); see also Rosciszewski, 1 F.3d at 231; Marcus v. AT&T Corp., 138 F.3d 46, 52-53 (2d Cir. 1998). In such cases, removal is appropriate *494 under the doctrine of complete preemption.
The complete preemption doctrine has been invoked by the Supreme Court in only three contexts since its inception: claims under the Labor Management Relations Act (LMRA), 29 U.S.C. § 141, et. seq., between a labor union and employer under a collective bargaining agreement, see Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 561-62, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968); certain claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et. seq., see Metropolitan Life, 481 U.S. at 65-67, 107 S.Ct. 1542; and claims regarding certain Indian land grant rights, see Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666-67, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). In 1993, the Fourth Circuit concluded that § 301 of the Copyright Act, 17 U.S.C. § 301(a), also supported complete preemption. Rosciszewski, 1 F.3d at 232-33.
Due to its infrequent usage, the precise rules for finding complete preemption are unclear. "[T]he evolution of the doctrine ... has been one of fits-and-starts and zig-zags and has, not surprisingly, occasioned both confusion and disagreement among the federal circuit and district courts." Schmeling v. NORDAM, 97 F.3d 1336, 1339 (10th Cir.1996) (quoting Burke v. Northwest Airlines, Inc., 819 F.Supp. 1352, 1356 (E.D.Mich.1993)). "The inclusion of the term `preemption' within the doctrine's label, while not inaccurate, has enkindled a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption." BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc., 182 F.3d 851, 854 (11th Cir.1999); Johnson v. Baylor Univ., 214 F.3d 630, 632 (5th Cir.2000). Complete preemption is not triggered merely because a defendant successfully raises a federal preemption defense. To support an argument for removal based on complete preemption, a defendant must show not only that the plaintiff's claim is preempted under principles of federal law, but also that Congress intended to allow him to litigate the equivalent of his state claim in a federal forum. BLAB T.V., 182 F.3d at 857.
The complete preemption doctrine was first applied in Avco Corp., 390 U.S. at 560-62, 88 S.Ct. 1235, where the Supreme Court determined that an employer's attempt to have union employees enjoined from striking was a suit "arising under the `laws of the United States' within the meaning of the removal statute," even though the suit was brought in state court and invoked principles of state contract law. Years later, in Franchise Tax Board, the Court characterized Avco in this manner:
The necessary ground of decision was that the preemptive force of § 301 [of the LMRA] is so powerful as to displace entirely any state cause of action `for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301. Avco stands for the proposition that if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily `arises under' federal law.
Franchise Tax Bd., 463 U.S. at 23-24, 103 S.Ct. 2841.
The Franchise Tax Board Court considered the propriety of removing a state court action filed by a state tax board to enforce levies against an ERISA trust fund. The Court concluded that ERISA preemption did not convert the agency's *495 state claim into a federal one because, unlike § 301 of the LMRA and the plaintiff in Avco, ERISA "did not provide an alternative cause of action in favor of the states to enforce its rights." Franchise Tax Bd., 463 U.S. at 26, 103 S.Ct. 2841. The Court also found it important that, "[u]nlike the contract rights at issue in Avco, the State's right to enforce its tax levies is not of central concern to [ERISA]." Id. at 25-26, 103 S.Ct. 2841.
In Metropolitan Life, however, the Supreme Court determined that a state court action that was both preempted by and within the scope of § 502(a) of ERISA would be completely preempted under the Avco rule.[21] 481 U.S. at 64-67, 107 S.Ct. 1542. The Court came to this conclusion, although reluctantly, for two reasons. First, the jurisdictional grant of § 502(a) was virtually identical to that of the LMRA, which the court had previously found indicative of complete preemption. Id. at 65-66, 107 S.Ct. 1542. Second, the legislative history of ERISA revealed a clear Congressional intent that suits to enforce benefits under ERISA plans be treated as "arising under the laws of the United States in similar fashion to those brought under section 301 of the [LMRA] of 1947." Id. (quoting H.R. Conf. Rep. No. 93-1280, p. 327 (1974)). These factors, taken together, demonstrated Congress's intent to make causes of action within the scope of § 502(a) removable to federal court. Id.
Avco, Franchise Tax Board, and Metropolitan Life suggest several factors that should be considered in determining whether removal is appropriate based on the doctrine of complete preemption. These include:
whether the state claim is displaced by federal law under an ordinary preemption analysis, whether the federal statute provides a cause of action, what kind of jurisdictional language exists in the federal statute, and what kind of language is present in the legislative history to evince Congress's intentions.
BLAB T.V., 182 F.3d at 857. In evaluating these factors, a court must keep in mind that the "touchstone" of the inquiry is not the "obviousness" of the preemption defense, but the intent of Congress. Metropolitan Life, 481 U.S. at 66, 107 S.Ct. 1542; Rosciszewski, 1 F.3d at 231-32.
Defendants articulate two statutory provisions which they believe support complete preemption: 47 U.S.C. § 332(c)(3), and 47 U.S.C. § 332(c)(7)(B)(iv).
47 U.S.C. § 332(c)(3)(A) provides:
[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.
47 U.S.C. § 332(c)(7)(B)(iv) provides:
No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.
*496 Several appellate and district courts already have determined that the provisions of the FCA do not serve as a basis for removal pursuant to the complete preemption doctrine. Smith v. GTE Corp., 236 F.3d 1292, 1312-13 (11th Cir.2001) (the FCA does not provide a basis for removal pursuant to the complete preemption doctrine); Marcus, 138 F.3d at 53 (same); Quayle v. MCI WorldCom, Inc., 2001 WL 1329594, **1-3, 2001 U.S. Dist. LEXIS 17450, *5-10 (N.D.Cal. Oct. 22, 2001) (unpubl.) (same); Braco v. MCI Worldcom Communications, Inc., 138 F.Supp.2d 1260, 1268-69 (C.D.Cal.2001) (same); Crump v. WorldCom, Inc., 128 F.Supp.2d 549, 556-60 (W.D.Tenn.2001) (the comprehensive nature of the regulatory scheme created by the FCA does not support complete preemption).
According to defendants, these holdings are of dubious relevance to the present case because they address the propriety of complete preemption in the context of wire-line rather than wireless communications, the latter area being where Congress has expressed a strong national interest in uniformity across state boundaries. Although this distinction could be considered significant, a number of courts have declined to invoke complete preemption in the area of wireless communications as well. See Shaw v. AT & T Wireless Services, Inc., 2001 WL 539650, **1-4, 2001 U.S. Dist. LEXIS 6589, *4-14 (N.D.Tex. May 18, 2001) (unpubl.) (§ 332(c)(3) does not support complete preemption); Bell Atlantic Mobile, Inc. v. Zoning Board of Butler Township, 138 F.Supp.2d 668, 676-77 (W.D.Pa.2001) (§ 332(c)(7) does not support complete preemption); State of Iowa v. United States Cellular Corp., 2000 U.S. Dist. LEXIS 21656, at *15-16 (S.D.Iowa 2000) (unpubl.) (§ 332 does not support complete preemption); Bryceland v. AT & T Corp., 122 F.Supp.2d 703, 706-10 (N.D.Tex.2000) (same); Aronson v. Sprint Spectrum, L.P., 90 F.Supp.2d 662, 664-69 (W.D.Pa.2000) (same); Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc., 958 F.Supp. 947, 952-58 (D.Del.1997) (same); but see Bastien v. AT&T Wireless Services, Inc., 205 F.3d 983, 986-90 (7th Cir.2000) (§ 332(c)(3)(A) supports complete preemption). These courts have done so primarily because of the absence of indicia that Congress intended any of the provisions of the FCA, including the preemptive provisions of § 332, to permit removal.[22]
*497 Defendants argue that plaintiffs' claims are completely preempted by § 332 because plaintiffs, by asking state courts to enjoin the provision of cell phones without headsets on the basis of RF emissions, are essentially inviting state courts to regulate entry on the basis of radio frequency concerns, which §§ 332(c)(3)(A) and 332(c)(7)(B)(iv) expressly prohibit. Plaintiffs, on the other hand, contend that a state tort headset requirement is not a condition of entry as contemplated by § 332(c)(3), nor is a portable phone a "facility" for purposes of § 332(c)(7). The court does not need to reach these questions because, while §§ 332(c)(3) and (c)(7)(B)(iv) undoubtedly are strong express preemption provisions which may be held in state court to bar relief of the sort plaintiffs request,[23] neither provision demonstrates removal intent. Bryceland, 122 F.Supp.2d at 710; Aronson, 90 F.Supp.2d at 667-68; Bauchelle, 989 F.Supp. at 646-48. To the contrary, and unlike the ERISA and the LMRA, the FCA contains a savings clause which provides, "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414. "The existence of this type of `savings' clause which `contemplate[s] the application of state-law and the exercise of state court jurisdiction to some degree ... counsels against a conclusion that the purpose behind the ... Act was to replicate the unique preemptive force of the LMRA and ERISA.'" Smith, 236 F.3d at 1313 (quoting BLAB, 182 F.3d at 857-58); Marcus, 138 F.3d at 54; Bryceland, 122 F.Supp.2d at 710; Aronson, 90 F.Supp.2d at 668; Bauchelle, 989 F.Supp. at 648; Weinberg, 165 F.R.D. at 441; see also Geier v. American *498 Honda Motor Company, Inc., 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("[A] savings clause assumes that there are some significant number of common-law liability cases to save."). Moreover, there is nothing in the legislative history or jurisdictional provisions of the FCA to suggest that Congress intended claims preempted by § 332 to "arise under" federal law in the same way as § 502 of ERISA or § 301 of the LMRA. Indeed, although § 332(c)(3) manifests a clear Congressional intent to act preemptively with regard to rates and market entry, the provision, by its own terms, is "narrowly conceived." Bryceland, 122 F.Supp.2d at 707 n. 3. By allowing states to regulate "other terms and conditions of commercial mobile services," the language of the provision itself suggests that Congress did not intend for it to support complete preemption. Id.
Defendants suggest that a clear indication of removal intent is not required in the Fourth Circuit under Rosciszewski v. Arete, 1 F.3d 225. In Rosciszewski, the Fourth Circuit extended the complete preemption doctrine to § 301 of the Copyright Act, 17 U.S.C. § 301. Rosciszewski, 1 F.3d at 228. The plaintiff in Rosciszewski brought an action in state court against alleged appropriators of his copyrighted computer program on the grounds that their conduct violated a Virginia statute prohibiting copying by use of computer. Id. The defendants removed to federal court, and the court found the plaintiff's claims completely preempted by § 301. Id.
Nothing in Rosciszewski, however, is inconsistent with the notion that complete preemption requires removal intent. Indeed, after acknowledging that the doctrine has been sparingly and reluctantly applied, Rosciszewski, 1 F.3d at 231, the Fourth Circuit found the requisite intent for two reasons. Id. at 231-33. First, the court observed that the legislative history of § 301 indicates that the provision was "`intended to be stated in the clearest and most unequivocal language possible so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively.'" Id. (quoting H.R.Rep. No. 1476, 94th Cong.2d Sess. 1390 (1976)). Moreover, the court emphasized that Congress granted exclusive jurisdiction over copyright matters to federal courts, while permitting concurrent jurisdiction over claims under ERISA and the LMRA. Id. In the view of the Fourth Circuit, this jurisdictional grant is "strong evidence that Congress intended copyright litigation to take place in federal courts." Id. at 232. Such evidence "compels the conclusion that Congress intended that state-law actions preempted by § 301(a) of the Copyright Act arise under federal law." Id.
Although the Rosciszewski court looked for and found removal intent, certain aspects of the Copyright Act precluded evaluating Congress's removal intent based on the specific factors found important by the Supreme Court in Metropolitan Life. When § 301 of the Copyright Act was enacted, for example, claims within the exclusive jurisdiction of federal courts could not be removed because of the derivative jurisdiction rule. Rosciszewski, 1 F.3d at 233, n. 6 (citations omitted). Since a claim under the Copyright Act would therefore have had to be brought in federal court directly (because federal courts had exclusive jurisdiction over such claims), questions about whether such claims could be removed were of no import. After Congress abolished the derivative jurisdiction rule in 1987, id., federal courts were able to hear claims removed from state court even if the state court did not itself have jurisdiction. Id. (citing 28 U.S.C.A. § 1441(e) (West Supp.1993)). Because the question of removal was inapplicable *499 at the time of the statute's enactment, however, the fact that removal was not mentioned in the legislative history could not be determinative of Congressional intent. Id. (citations omitted). Moreover, because the Copyright Act's exclusive jurisdiction provision was adopted before the Supreme Court's application of the complete preemption doctrine in Avco and Metropolitan Life, the court declined to "draw a negative inference from the failure of Congress" to make copyright matters removable with the same language used in the jurisdiction provisions of ERISA and the LMRA. Id.; cf. Metropolitan Life, 481 U.S. at 65-66, 107 S.Ct. 1542 (relying on statement in ERISA's legislative history that actions for benefits under ERISA plans are to be regarded as arising under federal law in the same manner as actions under § 301 of the LMRA).
The unique factors present in Rosciszewski are not present here. The FCA was amended in 1993 and 1996. During both of these time periods, Congress knew of the Supreme Court's interpretations of sections 301 of the LMRA and 502(a) of ERISA in Avco and Metropolitan Life, and could have expressly indicated removal intent if it desired to do so. Nothing in the legislative history or jurisdictional language of the FCA amendments expresses removal intent. The only court to have held otherwise is the Seventh Circuit in Bastien v. AT&T Wireless Servs., Inc., 205 F.3d 983 (7th Cir.2000). In Bastien, the plaintiff sued AT & T in state court, alleging breach of contract and consumer fraud because he was experiencing a high number of dropped calls. The Seventh Circuit not only determined that Bastien's claims constituted state regulation of entry conditions in violation of § 332(c)(3), but also found § 332(c)(3) sufficient to support removal of the plaintiff's claim under the complete preemption doctrine. Id. at 987. The Seventh Circuit did not, however, engage in the analysis used by either the Supreme Court or the Fourth Circuit, as it did not look for removal intent in either the jurisdictional language or legislative history. Accordingly, this court cannot rely on Bastien as persuasive authority. The defendants have not established the requisite factors for complete preemption, and this court does not have jurisdiction over plaintiffs' claims by virtue of the complete preemption doctrine.

V. FEDERAL OFFICER PROVISION
Finally, defendants argue that removal is proper under 28 U.S.C. § 1442(a)(1), which provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." In order to satisfy this provision, the defendants must (1) raise a colorable federal defense to the claims asserted against them; (2) show that they were acting under the direction of a federal officer; and (3) demonstrate a causal nexus between plaintiffs' claims and acts they performed under color of federal authority. Pack v. AC & S, Inc., 838 F.Supp. 1099, 1101 (D.Md.1993) (citing Mesa v. California, 489 U.S. 121, 124-25, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)). Plaintiffs argue that defendants have failed to meet the last two requirements. The court agrees.
Most courts have held that in order for a defendant to be "acting under" a federal officer, the federal officer must have "`direct and detailed control' over the defendant." Fung v. Abex Corp., 816 F.Supp. 569, 572 (N.D.Cal.1992) (citing Ryan v. Dow Chemical Co., 781 F.Supp. 934, 947 (E.D.N.Y.1992)). "This control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court `based upon actions taken pursuant to federal *500 direction.'" Id. (quoting Gulati v. Zuckerman, 723 F.Supp. 353 (E.D.Pa. 1989)). In Ryan, the court explained:
The rule established is that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. ... By contrast, a person or corporation establishing only that the relevant acts occurred under the general auspices of a federal office or officer is not entitled to section 1442(a)(1) removal. Likewise, the mere fact that a corporation participates in a regulated industry is insufficient to support removal absent a showing that the particular conduct being sued upon is closely linked to detailed and specific regulations.
781 F.Supp. at 947 (citation omitted).
Defendants argue that removal under § 1442(a)(1) is proper because "(1) the claims in these actions are directed at the design and configuration of wireless phones, and (2) the FCC specifically directed defendants to sell or provide only telephones emitting approved levels of RF." (Def. Opp. to Pl. Mot. for Remand, p. 63.) Defendants have not shown, however, that they were "acting under" federal officials with respect to the specific acts for which they are being sued. Plaintiffs' suit is based on defendants' failure to provide headsets with wireless phones. Thus, to support removal defendants must show not only that the phones were built according to FCC specifications, but also that the FCC restricted or prohibited them from providing additional safeguards, such as headsets, to consumers. See Ruffin v. Armco Steel Corp., 959 F.Supp. 770, 774 (S.D.Tex.1997), opinion vacated by Ruffin v. Armco Steel Corp., 1999 WL 318023 (S.D.Tex.1999) (because case transferred to Judicial Panel on Multidistrict Litigation); Arness v. Boeing North American, Inc., 997 F.Supp. 1268, 1275 (C.D.Cal. 1998). Defendants have failed to show this.[24] Accordingly, removal based on the federal officer provision is improper.
A separate order follows.

ORDER
For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:
1. the plaintiffs' consolidated and renewed motion for remand is DENIED; and
2. copies of this Order and the accompanying Memorandum shall be sent to counsel of record.
NOTES
[1] Each of the five complaints, which are substantially similar in all material respects, asserts some combination of the following state law claims: strict products liability (failure to warn, design or manufacturing defect); violations of state consumer protection laws; breach of implied warranties; negligence; fraud; fraud by concealment; and civil conspiracy. For purposes of this memorandum, the court will use the Pinney complaint as representative of the complaints.
[2] Throughout their pleadings, plaintiffs assert that the complete preemption doctrine is not properly before the court because defendants failed to mention it in their removal notices. Defendants, on the other hand, argue that by mentioning "preemption" three times, and extensively citing complete preemption case-law, they have satisfied the minimal notice pleading required. The court need not resolve this dispute, because its decision to exercise jurisdiction is not based on the complete preemption doctrine.
[3] Indeed, federal law creates the plaintiff's cause of action in the vast majority, though not all, of cases involving a substantial federal question. Merrell Dow, 478 U.S. at 808, 106 S.Ct. 3229 (citing Franchise Tax Bd., 463 U.S. at 9, 103 S.Ct. 2841); see also Ormet Corp. v. Ohio Power Co., 98 F.3d 799, 805 (4th Cir. 1996). The cause of action may be expressly created (i.e., apparent from the language of the statute), or implied. Merrell Dow, 478 U.S. at 810-811, 106 S.Ct. 3229; Ormet, 98 F.3d at 805.
[4] Plaintiffs contend that the Supreme Court's decision in Merrell Dow precludes application of the substantial federal question doctrine to the present case. The court disagrees. In Merrell Dow, the Court considered whether to exercise jurisdiction over a state court action brought by consumers against a drug manufacturer, based in part on the theory that the manufacturer's alleged violation of the Food Drug and Cosmetic Act ("FDCA") constituted negligence. Writing for the majority, Justice Stevens articulated the question before the court as "whether the incorporation of a federal standard in a state-law private action, when Congress has intended that there not be a federal private action for violations of that federal standard, makes the action one `arising under the Constitution, laws, or treaties of the United States,'" for the purposes of federal jurisdiction. Merrell Dow, 478 U.S. at 805, 106 S.Ct. 3229 (quoting 28 U.S.C. § 1331). Noting that Congress did not intend a private federal remedy for violations of the FDCA, id. at 810, 106 S.Ct. 3229, the Supreme Court summed its holding in Merrell Dow in this manner:

We simply conclude that the congressional determination that there should be no federal remedy for the violation of this federal statute is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently `substantial' to confer federal question jurisdiction.
Merrell Dow, 478 U.S. at 814, 106 S.Ct. 3229.
In the present case, however, plaintiffs have not challenged the "violation of a federal statute." Rather, they dispute the sufficiency of the regulations carrying out the statute itself. Congress has provided several federal causes of action that protect plaintiffs' right to do so. A cause of action is available to plaintiffs, for example, under the FCC's rules of practice and procedure, which provide that "[a]ny interested person may petition for the issuance, amendment, or repeal of a rule or regulation." 47 C.F.R. § 1.401(a). Since federal appellate courts have exclusive jurisdiction over the review of FCC rules and orders, judicial review of an FCC decision declining to impose stricter safety regulations, such as a headset requirement, would be conducted in federal court. 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1). Section 10(a) of the Administrative Procedures Act ("APA") also provides plaintiffs a federal remedy by allowing private citizens to challenge an agency's NEPA compliance in federal district court. See, e.g., Sierra Club v. Slater, 120 F.3d 623, 630-31 (6th Cir.1997); Muhly v. Espy, 877 F.Supp. 294, 298 (W.D.Va.1995). Although these provisions may not provide the plaintiffs with a cause of action against these defendants, they demonstrate Congressional intent to support the plaintiffs' right to adequate protection from unsafe levels of RF radiation, which is, as discussed more fully elsewhere in this memorandum, the only interest at stake in this litigation. Thus, to the extent that Merrell Dow's requirement of a federal private remedy is applicable, see Mulcahey, 29 F.3d at 152, it is met in the present case.
[5] The FCC continued to recognize a "complementary" role for state certification of carriers. Cellular Communications Systems, ¶ 83.
[6] Although the FCC did not initially consider itself responsible for evaluating and controlling the environmental impact of radiation from wire-line technology and radio communications, the agency adopted guidelines for limiting electromagnetic radiation emissions from televisions, telephones, radios, and various antennae after the passage of the National Environmental Policy Act ("NEPA") of 1969. Pub.L. No. 91-190, 83 State 852 (codified at 42 U.S.C. § 4321, et. seq. (1994)) (requiring federal agencies to examine and address the environmental effects of their policies). From 1985 to 1991, the FCC limited RF emissions from wireless service facilities in accordance with the standards promulgated by the American National Standards Institute ("ANSI"), which is "internationally recognized for [its] expertise in this area." In re Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(iv) of the Communications Act of 1934, Release No. 97-303, ¶ 32 (August 25, 1997) (the "FCC Second Order") (Def. Appendix, Tab 6). ANSI replaced its standards with a more stringent set in 1992. In re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, 8 F.C.C.R. 2849, ¶ 6, 1993 WL 757412 (1993) (Def. Appendix, Tab 7). The FCC issued a public notice that it was considering amending its guidelines to reflect the ANSI changes in 1993. Id.
[7] "SAR is a measure of the rate of energy absorption due to exposure to an RF transmitting source." 47 C.F.R. § 2.1093(d).
[8] One year after these regulations were issued, the FCC amended them in response to petitions for reconsideration. In re Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934, Release No. 97-303, ¶ 12 (August 25, 1997) (Def. Appendix, Tab 6) (the "FCC Second Order"). These amendments did not, however, alter the mandate of the First Order as it related to wireless phones. In fact, the Second Order specifically affirmed the RF exposure limits articulated by the FCC in the First Order. FCC Second Order, ¶¶ 2, 39.
[9] With regard to the collaborative process used in adopting the current RF guidelines, the FCC also has stated:

In reaching our decision on the adoption of new RF exposure guidelines we have carefully considered the large number of comments submitted in this proceeding, and particularly those submitted by the U.S. Environmental Protection Agency (EPA), the Food and Drug Administration (FDA) and other federal health and safety agencies. The new guidelines we are adopting are based substantially on the recommendations of those agencies, and we believe that these guidelines represent a consensus view of the federal agencies responsible for matters relating to the public safety and health.
FCC First Order, ¶ 2.
[10] The FCC emphasized its deference to other federal health and safety agencies in both the First and Second Orders:

Although most commenting parties generally support our proposal to adopt the 1992 ANSI/IEEE guidelines, some of the Federal agencies filing comments in this proceeding, principally those with responsibility for oversight regarding health and safety issues, object to the use of certain aspects of these guidelines. In the past, the Commission has stressed repeatedly that it is not a health and safety agency and would defer to the judgment of these expert agencies with respect to determining appropriate levels of safe exposure of RF energy. We continue to believe that we must place special emphasis on the recommendations and comments of Federal health and safety agencies because of their expertise and their responsibilities with regard to health and safety matters.
FCC First Order, ¶ 28.
With regard to DOD's claim that our proposal was not properly coordinated with other agencies, we note that our proposal was coordinated with the federal agencies with health and safety responsibilities. These agencies include the EPA, the FDA, the National Institute for Occupational Safety and Health (NIOSH), and the Occupational Safety and Health Administration (OSHA). Each of these agencies sent letters to the FCC supporting our action.
FCC Second Order, ¶ 37.
[11] The FDA has acknowledged its role in the multi-agency approach to regulating the safety of wireless phones: "The FDA shares regulatory responsibilities for wireless phones with the [FCC]. All phones that are sold in the United States must comply with FCC safety guidelines that limit RF exposure. FCC relies on FDA and other health agencies for safety questions about wireless phones." U.S. Food and Drug Administration, Consumer Update on Wireless Phones, July 18, 2001, available at www.fda.gov/cdrh/oca/mobilphone.html (Def. Appendix, Tab 11.)
[12] According to the FCC, the EPA also supports this "consensus" view of the RF guidelines.

[The] EPA has recently informed the [FCC] that "[t]he information base on non-thermal effects has not changed significantly since the EPA's original comments in 1993 and 1996. The majority of currently available studies suggests that there are no significant non-thermal human health hazards. It therefore continues to be EPA's view that the FCC exposure guidelines adequately protect the public from all scientifically established harms that may result from RF energy fields generated by FCC licensees."
FCC Brief, 23 n. 12 (quoting Letter from Robert Brenner, Acting Deputy Asst. Administrator for Air and Radiation, to Dale Hatfield, Chief, FCC Office of Engineering and Technology, dated April 30, 1999) (Def. Appendix, Tab 4.)
[13] Both the FDA and the FCC have publicly reaffirmed their belief that existing scientific data does not indicate that FCC-compliant wireless phones are biologically harmful. See, e.g., U.S. Food and Drug Administration, Center for Devices and Radiological Health, Consumer Update on Mobile Phones (Oct. 20, 1999) (Appendix, Tab 13). The latest FCC consumer information pamphlet states:

Cell Phones and Your Health
... The FCC requires cell phone manufacturers to ensure that their phones comply with [the FCC's] objective limits for safe exposure. Any cell phone at or below these SAR levels (that is, any phone legally sold in the U.S.) is a "safe" phone as measured by these standards...
There is no scientific evidence to date that proves that wireless phone usage can lead to cancer or other adverse health effects, such as headaches, dizziness, elevated blood pressure, or memory loss. However, studies are ongoing, and key government agencies such as the FDA continue to monitor the results of the latest scientific research on this topic. See FDA Web site at www.fda.gov/cdrh/phones. Also, the World Health Organization (WHO) has established an ongoing program to monitor research in this area and make recommendations related to the safety of mobile phones. See WHO Web site at www.who.int/peh-emf.
Market Sense, Cell Phones: Facts, Fiction, Frequency, available at http:// www.fcc.gov/cib/cell_phones.html (Appendix, Tab 10).
[14] The Farina Complaint alleges violations under Pennsylvania's Unfair Trade Protection and Consumer Protection Law, and the Gilliam Complaint alleges violations under New York's Consumer Protection for Deceptive Products Act. The Gimpelson and Naquin Complaints allege only Georgia and Louisiana common law theories of liability, respectively.
[15] Paragraph 42 of the Pinney Complaint states:

42. The named Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated for the purpose of asserting the claims alleged on a common basis.
The proposed class is defined as:
(a) All purchasers or lessees of WHHPs ("wireless hand-held phones") who are residents of the State of Maryland, and who were residents of the State of Maryland when they purchased or leased a WHHP, who have not been diagnosed with a brain related tumor or cancer of the eye and who were not furnished a headset at the time they purchased or leased their WHHP; and
(b) All future purchasers of WHHPs who are residents of the State of Maryland and who have not been diagnosed with a brain related tumor or cancer of the eye.
[16] In the Pinney Complaint, the plaintiffs pray for the following relief:

a. For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiff J. Douglas Pinney and for each Class Member;
b. Reimbursing Plaintiff Patricia S. Colonell and for each Class Member purchaser or lessee of a WHHP the cost incurred in purchasing or acquiring a headset;
c. Providing each Class member who has not been so provided a WHHP that can be used with a headset;
d. Providing each Class member with instructions for the use of a headset, as well as reasons why a headset should be used;
e. For punitive damages to Plaintiffs and other members of the Class;
f. For injunctive relief preventing the future sale of WHHPs without headsets and appropriate instructions and warning;
g. For costs, attorney fees, and legal prejudgment interest; and
h. An Order certifying the Class and appointing the Plaintiffs and their counsel to represent the Class.
(Pinney, ¶ 100(a)-(h).)
[17] In response to the question "Do hands-free kits [i.e., headsets] for wireless phones reduce risks from exposure to RF emissions?," the FCC and the FDA state: "Since there are no known risks from exposure to RF emissions from wireless phones, there is no reason to believe that hands-free kits reduce risks.... Wireless phones marketed in the U.S. are required to meet safety requirements regardless of whether they are used against the head or against the body. Either configuration should result in compliance with the safety limit." See FDA & FCC, Cell Phone Facts, Consumer Information on Wireless Phones, available at http://www.fda.gov/cell-phones/qa.html. (See also Letter to Court from Def. re: "In re Wireless Telephone Radio Frequency Litigation," dated May 6, 2002, pp. 1-2.)
[18] In the present case, plaintiffs assert that the ANSI standards defendants complied with in manufacturing their phones before 1989 were "based solely on the thermal effects associated with RFR and did not contemplate or consider the possibility that RFR exposure could give rise to non-thermal biological injury and subsequent adverse health effects."

(Pinney Complaint, ¶ 72.) In their Motion to Remand, plaintiffs further declare:
The FCC has set guidelines for the thermal effects of environmental exposure to RF emissions from WHHPs. It does not regulate the non-thermal biological effects of RF radiation upon human brain tissue of the immediate userthe subject of these actions.
(See Pl. Mot. to Remand, p. 11 (citing Cellular Phone Taskforce, 205 F.3d at 90-92).)
In Cellular Phone Taskforce, however, the Second Circuit stated, "In promulgating their standards, both the ANSI and the NCRP considered non-thermal effects." Cellular Phone Taskforce, 205 F.3d at 90. Upon review of their conclusions, the court found that "[a]t most, the newly submitted evidence established that the existence of non-thermal effects is `controversial,' and that room for disagreement exists among experts in the field." Id. Concluding that the FCC's reliance on ANSI and NCRP was "reasonable" and "justified," id. at 90-91, the Second Circuit upheld the federal regulations. Thus, any assertion that the FCC does not consider the non-thermal effects of radio frequency radiation appears to be incorrect.
[19] Plaintiffs argue that Ormet is "neither `controlling' nor instructive" because it is not a removal case. (See Pl. Reply, p. 2). At the same time, however, plaintiffs rely on Fair v. Sprint Payphone Services, Inc., 148 F.Supp.2d 622, 626 (D.S.C.2001), to support their argument that remand is proper in the present case. In Fair, the families of inmates sued the state of South Carolina in state court, alleging that it had violated state law by entering into contracts for inmate payphone services which charged family members uncompetitive rates. Id. at 624. Defendants argued that removal was proper because the FCA gives the FCC authority to regulate payphone compensation plans. Id. Finding the FCC's actual regulations on payphone compensation plans to be less than comprehensive, the court declined to exercise jurisdiction solely on the basis of an authority to regulate, and remanded the case to state court. Id. at 625. On the propriety of remand, therefore, Fair is easily distinguishable from the present litigation. In contrast to the FCC's regulation of payphone compensation plans, the FCC has fully and comprehensively regulated radio frequency radiation from telecommunications facilities, as is extensively discussed throughout this memorandum. With regard to plaintiffs' assertion about the applicability of Ormet, the court notes that Fair took pains to distinguish Ormet, explaining that, unlike Ormet, the "state court will not need to interpret any core term of section 276 [of the Telecommunications Act] to decide whether the plaintiffs' claims can succeed." Id. at 626. Thus, while not a removal case, Ormet is relevant to this court's determination of whether to exercise federal jurisdiction based on the substantial federal question doctrine. See also WRIGHT, MILLER, & COOPER, supra, § 3722 at 384-85 ("[I]t is quite appropriate to construe the provision in the removal statute in a manner that calls for the application of the general principles governing original federal question jurisdiction to the removal of state cases that involve questions of federal law.... Generally then, federal removal jurisdiction based on Section 1441(b) embraces the same class of cases as is covered by Section 1331, the original federal question jurisdiction statute."). Ormet is therefore both relevant and persuasive authority, as this court must apply the law of the Fourth Circuit in considering cases referred to it by the MDL panel. See In re Microsoft Corp. Antitrust Litig., 127 F.Supp.2d 702, 718 n. 15 (D.Md.2001) (citing In re Am. Honda Motor Co. Dealerships Relations Litig., 941 F.Supp. 528, 536-37 (D.Md.1996)).
[20] At the hearing held before the court on February 15, 2002, plaintiffs conceded that the only relief they seek is a judicial requirement that defendant cell phone manufacturers must provide headsets with wireless phones. This is illustrated by the following dialogue between the court and plaintiffs' counsel:

Mr. Howell: ... [Defendants] particularly are interested in the injunctive relief that is sought. It may well be that the wide-ranging prohibitory injunction might run afoul of federal law. That's obviously a defense that has to be honored if there is such a conflict by the state courts that decide the case.
Court: Then what would you have left? I mean assuming that in light of provisions under the Communications Act about entry for wireless service facilities and in light of the fact that it says that you can't, state and local government can't regulate on the basis of environmental effects of radio frequency emission, I mean if you kick out the injunctive relief, what is left in the state court cases?
Mr. Howell: There is a request for compensatory damages. There's 
Court: What sort of compensatory damages? Isn't it compensatory damages to buy headsets?
Mr. Howell: The cost of a headset which is I can say with some certainty is worth $19.99 per plaintiff. That is the basic relief. Whether a state court would have to go beyond that relief and say you're enjoined, I think is probably a question that is fairly debatable. Why would a court that orders full relief in the monetary form, you know, why would defendants object to such an award assuming its validity? Why would a defendant again fail to provide headsets? Certainly a state court would be reluctant to enjoin practices that have not yet occurred. You know, it might be some kind of supplemental relief. It could also be narrowly drawn....
Court: The only damages you're telling me about are the cost of headsets 
Mr. Howell: Right.
Court: which, to the extent that you're purporting to have a class of people that [is] going to proceed into the future, I mean I don't see exactly how you do that other than in some injunctive form. But isn't it in substance anyway the same thing as injunctive relief? I mean if you're telling the people that sell the wireless phone that they must provide headsets or money to buy them 
Mr. Howell: Yeah....
(See In re Wireless Telephone Radio Frequency Products Liability Litigation, Civ. No. 01-MD-1421, Transcript of Motion to Remand Before Judge Catherine C. Blake, February 15, 2002, pp. 15-18.)
[21] Section 502(a)(1)(B) of ERISA provides:

A civil action may be brought
(1) by a participant or beneficiary
* * * * * *
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.
[22] Another factor federal courts consider in determining whether complete preemption is properly invoked is whether the plaintiff's state claim falls within the civil enforcement provisions of the federal statute. Franchise Tax Bd., 463 U.S. at 24-26, 103 S.Ct. 2841; Aronson, 90 F.Supp.2d at 665-67. To this end, defendants invoke 47 U.S.C. § 207 as the FCA provision that provides an enforcement mechanism:

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.
47 U.S.C. § 207. A related provision, 47 U.S.C. § 206, declares a common carrier liable for damages for violations of the FCA.
To support complete preemption, a statute must create a cause of action that vindicates the same interest as that which the plaintiff's state claim seeks to enforce. Aronson, 90 F.Supp.2d at 666 (citing Railway Labor Exec., 858 F.2d at 942). Defendants proffer 47 U.S.C. § 201 as the federal provision affording plaintiffs the substantive rights they seek. Section 201(b) provides, in pertinent part: "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Defendants argue that the claim they have negligently and fraudulently provided unsafe products to the public constitutes a type of "unreasonable practice" prohibited by § 201, for which there is a damages remedy under § 207. Defendants concede, however, that the question of whether "practices" may be so broadly construed is one of first impression before this court.
Sections 207 and 206 are most often used with sections 201 or 203 to challenge unreasonable and discriminatory charges by telephone companies for long distance and/or wireless service. See, e.g., Marcus, 138 F.3d at 54 n. 1; Shaw, 2001 WL 539650, *3, 2001 U.S. Dist. LEXIS 6589, *11; Minnesota v. Worldcom, Inc., 125 F.Supp.2d 365, 369-70 (D.Minn.2000); Bryceland, 122 F.Supp.2d at 707-09; cf. Aronson, 90 F.Supp.2d at 666-67 (§ 207 provides a cause of action for plaintiffs challenging a service provider's practice of disclosing customer information in violation of 47 U.S.C. § 222). In contrast, §§ 201 and 207 have been held not to provide a cause of action for customers alleging claims of false advertisement, common law fraud, or deceptive business practices by commercial carriers. Marcus, 138 F.3d at 54; Minnesota v. Worldcom, 125 F.Supp.2d at 372; Bauchelle v. AT & T Corp., 989 F.Supp. 636, 645-46 (D.N.J.1997). Thus, to determine whether the FCA provides a cause of action against these defendants for plaintiffs' claims, the court would have to determine whether plaintiffs' products liability claims more closely resemble those for which the FCA provides a cause of action than those for which it does not. The court does not need to resolve this question, however, because even if §§ 201 and 207 provide a cause of action encompassing plaintiffs' claims, the FCA does not evidence Congressional intent to permit removal.
[23] Indeed, state courts faced with suits of this nature before the enactment of the 1996 amendments found such claims preempted by other provisions of federal law. Cf. Schiffner v. Motorola, Inc., 297 Ill.App.3d 1099, 232 Ill.Dec. 126, 697 N.E.2d 868, 874 (1998) (holding, pre-FTA, that claims that cell phones were unreasonably safe because of RF emissions were preempted by § 360kk(a)(1) of the Electronic Product Radiation Control Act); Verb v. Motorola, Inc., 284 Ill.App.3d 460, 220 Ill.Dec. 275, 672 N.E.2d 1287, 1293 (1996) (same).
[24] Indeed, as defendants concede elsewhere in their pleadings, the federal government has given them the option of providing headsets. (Def. Opp., p. 37 n. 16).